673 F.2d 91
 CANDIES TOWING CO., INC., Plaintiff-Appellant,
v.
M/V B & C ESERMAN, her engines, etc., Bect Offshore Service,
Inc., et al., Defendants-Appellees.
In the Matter of ESERMAN OFFSHORE SERVICES CO., INC., etc.,
Plaintiff-Appellee,
v.
CANDIES TOWING CO., INC., et al., Defendants-Appellants.
ProRICO INDUSTRIES, INC., Plaintiff-Appellant,
v.
AMERICAN HOME ASSURANCE CO., et al., Defendants-Appellees.
 No. 80-3862.
 United States Court of Appeals,
Fifth Circuit.
 April 12, 1982.
 
 Deutsch, Kerrigan & Stiles, Cornelius G. Van Dalen, Francis J. Barry, Jr., New Orleans, La., for Candies Towing Co., Inc.
 Montgomery, Barnett, Brown & Read, A. Gordon Grant, Jr., New Orleans, La., for ProRico Industries, Inc.
 Johnson & McAlpine, Michael L. McAlpine, New Orleans, La., for M/V B & C Eserman, American Home, & A & B Ins. Co.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, GOLDBERG and POLITZ, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 In this sugary sweet tale of oceangoing disaster, Candies Towing, owner of a sunken barge, and ProRico, owner of its cargo, sue the tug M/V B&C ESERMAN, and its owners, for the loss of barge and cargo. Trial before the District Court resulted in a judgment for the vessel. Ensnared in the rigging of the clearly erroneous rule, we affirm the factual findings and decree but modify in one important respect.
 
 
 2
 A Cargo of Molasses for Neptune's Graveyard
 
 
 3
 Following in the wake of the District Court, which set forth all the important facts, we will but summarize. Candies Towing, a Louisiana corporation, owned a steel hull, oceangoing barge, OC-250. It measured 250 feet in length, 72 feet of beam, and a depth of 15 feet. Built in 1970 as a deck barge, OC-250 later was converted by its owners for use as a liquid bulk carrier. It carried an A-1 certification of the American Bureau of Shipping and satisfied Coast Guard standards for a seagoing barge. The Coast Guard, in fact, inspected the barge and gave its approval on March 24, 1977, less than nine months before it sank.
 
 
 4
 The tug B&C ESERMAN is an 80-foot, 1250 horsepower twin screw diesel tug that carries a crew of four. It routinely operated with OC-250 to carry cargoes of liquid molasses between Mobile, Alabama and West Palm Beach, Florida.
 
 
 5
 From October 15-25, 1977, the barge underwent substantial maintenance and repair work at Hunt's Shipyard in Harvey, Louisiana. Although OC-250 had not suffered any accident or casualty, Hunt's employees repaired deck cracks, separations of welds in the internal frame work, two splits in the bottom, damage to the longitudinal bulkhead, and repaired or replaced internal frames and supports. All this work concentrated on the foreward section of the barge in way of the first two compartments. Following completion of the repairs and an inspection, OC-250 returned to service.
 
 
 6
 On November 27, 1977, B&C ESERMAN, while en route to Wilmington, North Carolina from West Palm Beach, grounded its laden tow, OC-250, on Frying Pan Shoal Reef. Although some question exists, it appears that the barge grounded stern-first on a hard sand reef, at a speed of 1 to 11/2 miles per hour, in calm seas. At the time, OC-250 carried a cargo of molasses to a draft of 101/2 feet forward and 111/2 aft.
 
 
 7
 Captain Jones, at the conn, lacked a fathometer, channel charts, tide tables, light lists, or other such aids to navigation. It was his first trip to Wilmington. He had no offshore license and was not a qualified navigator. His prior experience on seagoing tugs was as a wheelman or mate, not as a captain. Nor did he have the requisite number of licensed watchstanders on board.
 
 
 8
 Approximately ten hours later, high tide freed OC-250 from its strand, and the tow proceeded into Wilmington. There Captain Leo Spooner, Candies' representative, met the vessel as usual. Spooner, already aware from radio communications that OC-250 had gone aground, checked it out. He inspected each of the tanks after unloading and found no water in any of them. Personnel from ProRico and American Molasses also inspected the barge. No one found any damage or cause for concern. Following these inspections, Captain Spooner cleared OC-250 as fit to resume travel. The tow thus returned to West Palm Beach for the next voyage.[1]
 
 
 9
 Spooner and ProRico's representative again inspected OC-250 in West Palm Beach. After seeing its trim, freeboard and draft, Spooner found it fit. Despite deteriorating weather conditions, it set out for Mobile on December 4. After passing Dry Tortugas, the last point of land along the Florida Keys, Captain Jones noticed that the barge had sheered to the left. He had the tug circle the barge but found nothing wrong.
 
 
 10
 The weather indeed worsened. One winter storm, called a norther, hit on December 7, with seas of up to 15 feet. A second struck on December 9, with seas up to 20 feet and winds around 100 miles per hour. At dawn on December 10, Captain Jones noticed that the freeboard at the bow of the barge had increased, indicating that the stern was going down. Down, indeed, it went, in some 1300 feet of water, a total loss of both the barge and its cargo of 4248 short tons of bulk molasses.
 
 Bittersweet Results in the District Court
 
 11
 The District Court made extensive findings of fact. It held that the tug did not breach a duty to Candies, Captain Jones acted reasonably in sailing for Mobile despite the bad weather, and Candies failed to show that any of the clear statutory violations with regard to crew qualifications and watchstanding at sea "were in any way connected to" the sinking of the barge. The Court specifically found that the rule of THE PENNSYLVANIA, 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1873) did not apply since no collision had occurred, citing Garner v. Cities Service Tankers Corp., 456 F.2d 476, 1972 A.M.C. 1980 (5th Cir. 1972). It therefore granted a decree in favor of the tug B&C ESERMAN.
 
 M/V Scope of Review
 
 12
 In maritime as in most federal actions, the "clearly erroneous" rule applies to the review of the factual findings of the trial court. Thus we must accept the District Court's findings unless, upon reading the record and examining the exhibits, we are convinced that they are demonstrably incorrect. F.R.Civ.P. 52(a); McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed.2d 20 (1954); Allied Chemical Corporation v. Hess Tankship Company of Delaware, 661 F.2d 1044, ---- A.M.C. ---- (5th Cir. 1981). The findings of the District Judge, confronted with a mystery for which no apparent cause exists, float well above that Plimsoll Line. We affirm the findings and judgment of the District Court.
 
 
 13
 Accepting the factual findings does not yet put an end to this watery donnybrook, for we cannot anchor until we have addressed the District Court's treatment of the rule of THE PENNSYLVANIA, supra.
 
 
 14
 In simplest terms, that rule states that where a vessel is guilty of a statutory violation, the defaulting ship must show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." 86 U.S. (19 Wall) at 136, 22 L.Ed. at 151. See also Allied Chemical, supra, at 1052; G. Gilmore & C. Black, The Law of Admiralty (2d ed. 1975) § 10-25, at 898. It thus constitutes an evidentiary rule reversing the burden of proof. It does not render immaterial negligence, fault or damages but does impose a substantial burden upon the party at fault in proving its innocence.
 
 
 15
 The District Court simply erred as a matter of law in concluding that the rule of THE PENNSYLVANIA applies only in collision cases. The case on which the District Judge relied, Garner, supra, neither establishes nor supports any such holding. A hot water tank on the SS BRADFORD ISLAND exploded, killing one employee and injuring two others. The vessel owners sought to apply the rule of THE PENNSYLVANIA to force the shipyard, which had connected its 125 pounds per square inch (PSI) saturated steam system to the vessel's 70 PSI system, to prove that its action could not have contributed to the cause of the accident. This court, per the late Judge Gewin, refused. We began by pointing out,
 
 
 16
 Within the Fifth Circuit, the rule of THE PENNSYLVANIA has not been viewed as a rule of liability. The rule creates a shift in the burden of proof as to causation.... Although Cities Services cites authority in other circuits where the rule has been applied in cases not involving collisions between ships, we have found no instance where this court has done so.
 
 
 17
 456 F.2d at 480, 1972 A.M.C. at 1985 (citations omitted).
 
 
 18
 The inability to find such precedent, of course, by no means stamps such a possibility as incorrect. Indeed, our specific holding belied the District Court's broad generalization. We did not hold, nor have we ever held, that the rule of THE PENNSYLVANIA applies only to collision cases. Rather, we merely declined "to extend the rule of THE PENNSYLVANIA from its tort origins to the setting of contractual indemnity or breach of WWLP." Id. Thus, although the rule of THE PENNSYLVANIA rightfully has little application in a contractual indemnity action, an action far removed from its original port of call, Garner does not state and we do not interpret it to mean that in other tort actions, such as here, the rule does not apply.
 
 The Appropriate Vantage Point
 
 19
 This Court recently spoke on the subject and clarified the ramifications of Garner. In Reyes v. Vantage Steamship Co., 558 F.2d 238 (5th Cir. 1977), on rehearing, 609 F.2d 140 (5th Cir. 1980), we applied the rule of THE PENNSYLVANIA where a vessel lacked a required line-throwing device and its crew, in violation of the maritime rescue doctrine, made no effort to save a drowning sailor. The sailor, legally drunk at the time, decided to take a swim in the ocean and dived some 35 feet off the side of the vessel. He was spotted immediately by other crew members, who knew from the outset that he was in danger. Yet no one made any effort to rescue Reyes. These facts and the absence of the statutorily required line throwing device established negligence as a matter of law. Citing In re Seaboard Shipping Corp., 449 F.2d 132, 136, 1971 A.M.C. 2145, 2152 (2d Cir. 1971), cert. denied, 406 U.S. 949, 92 S.Ct. 2038-39, 32 L.Ed.2d 337 (1972), we explicitly held that the rule of THE PENNSYLVANIA extended to this man overboard situation:
 
 
 20
 Nothing that has been said impairs the principle that ... in Jones Act cases ... cause in fact is still necessary... Combining this slight standard of causation with the presumption of causation to which the plaintiff is here entitled means that on remand the ship owner must show that the ship's inaction and regulatory violations could not have been even a contributing cause of Reyes' death.
 
 
 21
 609 F.2d at 146, ---- A.M.C. at ---- (emphasis added).
 
 
 22
 In Seaboard Shipping, supra, two crew members of a barge died during a wild storm on Lake Michigan. The Second Circuit found that the barge was unseaworthy in three respects: its radio was out of order, its lifeboat was damaged, and its inflatable liferaft was improperly stowed. Seaboard, the barge owner, argued that in all probability none of those defects caused the deaths. Yet the Court refused to exonerate Seaboard, declaring,
 
 
 23
 We need go no further here than to say, however, that given the statutory violations alone (the liferaft stowage and the overloading), Seaboard is not entitled to exoneration. THE PENNSYLVANIA ... makes it clear that the burden is on a ship in violation of a safety statute-in this case the barge-to show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Seaboard is wrong in its contention that admiralty applies this rule only in collision cases. Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (fire on a tug caused by open-flame kerosene lamp carried on scow in statutory violation); The Denali, 112 F.2d 952 (9th Cir. 1940) (stranding case).[2]
 
 
 24
 449 F.2d at 136, 1971 A.M.C. at 2152. These cases, we believe, establish beyond doubt that the rule of THE PENNSYLVANIA does apply in non-collision cases.
 
 
 25
 Nor does U. S. v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251, 1975 A.M.C. 541 (1975), in any way alter our conclusion. Reliable Transfer, a tidal wave case in the admiralty, overruled only the time honored policy practice of dividing damages in a case of mutual or joint fault on a 50/50 basis. It does not bring into question the rule shifting the burden of proof. See Allied Chemical, supra at 1052; Atlantic Mutual Insurance Co. v. ABC Insurance Co., 645 F.2d 528, 531 n.9 (5th Cir. 1981); Tug Ocean Prince, Inc. v. U. S., 584 F.2d 1151, 1160, 1978 A.M.C. 1786, 1800 (2nd Cir. 1978).
 
 No Candy
 
 26
 Given our conclusion that the District Court erred in its discussion of THE PENNSYLVANIA rule, we necessarily must address its findings to determine whether we must remand. We conclude that we need not do so.
 
 
 27
 Two separate incidents took place: the grounding and the sinking. As to the first, we have fault but no damage; in the second, damage but no fault. While THE PENNSYLVANIA does impose a strenuous burden upon one guilty of statutory default, and we hesitate not a moment in declaring B&C ESERMAN negligent as to the grounding of the barge, it does not delete the requirement of causation with respect to the loss of the barge many days later under severe conditions of wave and weather. The District Court concluded, and we cannot disagree, that whatever B&C ESERMAN's statutory violations, whatever its negligence insofar as the grounding is concerned, neither had anything to do with the sinking. "Plaintiffs failed to show that any of the factors above, either individually or collectively, were in any way connected to the sinking of the barge." (emphasis supplied) B&C ESERMAN introduced testimony that the barge suffered from a weak internal framework. Such a weakness could cause the barge to "work", causing metal fatigue and, ultimately, breaking the internal structure. The extensive repair work done on OC-250, according to expert testimony, established such a weakness. The District Judge apparently credited this testimony and believed it furnished a more logical explanation for the sinking then the grounding two weeks previously. Thus, even if the District Court had correctly interpreted the rule of THE PENNSYLVANIA, it still would have granted judgment for the tug since neither the negligent grounding some two weeks before nor the statutory violations on the trip to Mobile could have caused the sinking.
 
 
 28
 The Court of Appeals, no less than Coke, does not require the performance of a useless act.[3] We therefore modify the opinion of the District Court as regards the rule of THE PENNSYLVANIA and, as modified, affirm.
 
 
 29
 AFFIRMED AS MODIFIED.
 
 
 
 [1]
 Candies Towing's marine expert, Captain Nielsen, testified that the only more thorough method of inspection would have been to employ divers or to drydock the barge
 
 
 [2]
 Kernan, in fact never cites THE PENNSYLVANIA but does apply this general maritime rule
 
 
 [3]
 Lex neminem cogit ad vana seu inutilia peragenda