**PENNZOIL PRODUCING COMPANY, et al.**

v.

**OFFSHORE EXPRESS, INC., et al.**

**UNITED GAS PIPELINE COMPANY**

v.

**OFFSHORE EXPRESS, INC., et al.**

Civ. A. Nos. 86–5753, 87–1296.

United States District Court, E.D. Louisiana.

Jan. 5, 1990.

Donald R. Abaunza, New Orleans, La., for plaintiffs.

James O.M. Womack, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

This case involves a claim for damages arising from the apparent contact between M/V GREEN CANYON EXPRESS and a pipeline owned by United Gas Pipeline Company on March 24, 1986 in an area where the pipeline crossed under the Houma Navigation Canal. It was tried before the Court commencing on September 28, 1989, for a determination of liability and damages. Final briefs were filed on December 4, 1989, at which time the Court took the case under consideration.

## FINDINGS OF FACT

1. On March 24, 1986, Offshore Express, Inc. owned and operated M/V GREEN CANYON EXPRESS, an offshore supply vessel, 185 feet in length, 38 feet in breadth and drawing approximately 6'3" forward and 9'6" aft.

2. On March 24, 1986, United Gas Pipeline Company owned and operated a twelve inch natural gas pipeline (the DuLarge pipeline) which was constructed to cross under the Houma Navigation Canal ("the Canal") approximately one quarter of a mile north of the Dulac Pontoon Bridge.

3. Pennzoil Producing Company, ARCO, Mobil, Harry Bourg Corporation, John T. Velkas, and C.T. Carden, are co-owners of the A.L. Voisin No. 1 Well ("Voisin Well") in Terrebonne Parish and are mineral lessees of the land on which the well is located. Their ownership is in the following percentages: Pennzoil—37.21%; ARCO—36.38%; Harry Bourg, C.T. Carden and John T. Velkas—21.42%; Mobil—4.98%.

4. Prior to March 24, 1986, the Voisin Well was producing from the 12,300' reservoir. The 12,300' reservoir produced gas, condensate, and water through a drive mechanism described as a "water drive". The energy used to induce flow to the surface was created by the water expanding in an attempt to replace the gas withdrawn from the reservoir. The well was "flow critical" and/or "rate sensitive". Any interruption or reduction in flow from the well was considered to be a condition that could lead to its early demise.

5. Gas produced from the Voisin Well had, since production began, entered the DuLarge pipeline owned by United Gas. At a point approximately two miles from the Voisin Well, the DuLarge pipeline passes beneath the Canal. Thus, the contact between the pipeline and M/V GREEN CANYON EXPRESS occurred about that distance from the well itself.

6. The DuLarge pipeline predates the 1961 construction of the Canal. To accommodate the dredging of the Canal, United Gas lowered the portion of the pipeline which was to pass beneath the channel. "Do not dredge" signs were posted on the original banks of the waterway to warn about the existing pipeline.

7. Since its construction in 1961, the Canal has widened considerably as a result of erosion. By March 1986, the Canal, at the point of the DuLarge pipeline crossing, had widened from its original 150' width to over 600' in some places. United Gas was aware of this.

8. Because the pipeline predated the Canal, a Corps of Engineers permit was not

required for this particular water crossing. The pipeline is authorized and maintained pursuant to a "grandfather" regulation found at 33 C.F.R. § 330.3. This provision authorizes the structure as long as "there is no interference with navigation."

9. United Gas did not have a regularly scheduled inspection program to check for mud cover over its pipeline, however the pipeline had been probed for mud depth in October 1985.

10. The October 1985 probe was not done with the assistance of a diver, but was done by probing with an unmarked bar from the surface. United Gas estimated that the pipeline was covered with approximately two feet of mud at the time of the probing. However, the main purpose of the probe was to locate the pipeline, not to determine mud depth.

11. Immediately after the October 1985 probe, the Corps of Engineers dredged the channel. The pipeline was not probed to determine the depth of mud covering after the dredging.

12. Despite its awareness of the erosion in the Canal, United Gas never lowered the pipeline on the approaches to the dredged channel before March 24, 1986.

13. After the accident the pipeline was removed and barnacle growth was found on some of the segments of pipeline which had broken away as a result of the accident. Barnacle growth normally occurs on a pipeline when it is not covered by mud. Thus, it is more likely than not that immediately preceding the accident the pipeline at or near the point of impact was at least partially uncovered.

14. On March 24, 1986, at approximately 0300 hours, M/V GREEN CANYON EXPRESS was proceeding northbound in the Houma Navigation Canal and had just passed the Dulac bridge. The visibility that night was very much impaired by fog.

15. Captain Corey who was at the helm of M/V GREEN CANYON EXPRESS was conning with the aid of a lookout positioned in the wheelhouse. He was using radar to locate the east and west banks of the canal.

Shortly after 0320 hours on March 24, 1986, the vessel apparently veered away from the north-south configuration of the deep water channel and almost immediately after the veering took place, struck the DuLarge pipeline.

16. M/V GREEN CANYON EXPRESS struck and ruptured the DuLarge pipeline approximately 25' outside or away from the deep water channel.

17. The port side of the vessel struck the pipeline and then slid along the pipeline, thereafter, the escaping gas erupted into flames and engulfed the stern area of the vessel.

18. The damage to the vessel indicates that the collision occurred at a point three to four feet below the waterline of the vessel.[1] The depth of water was five to six feet at the point of impact. Since the pipeline is 12″ in diameter, it is more likely than not that the pipeline was at least partially above the mud line.

19. Captain Corey's conning of the vessel in such a manner as to cause the vessel to veer away from the deep water channel, was negligent, in view of the fact that he was proceeding underway with markedly restricted visibility, made no use of the vessel's fathometer and/or spotlight, and proceeded at a speed greater than was prudent under the circumstances.

20. Immediately following the collision and rupture the Voisin Well automatically shut-in as a result of the loss of pressure in the DuLarge pipeline. Pennzoil became aware the Voisin Well had shut-in on the same day as the casualty.

21. The shut-in occurred due to the nature of the operation of the reservoir. The point of contact between the gas and water in the reservoir, the interface, was beneath the well perforations while the well was producing. The interface was being restrained in its movement by the flow of gas from the well. When the flow ceased as a result of the collision, the interface moved to point above the perforations in the wellbore, thereby preventing gas flow from being reinstituted. The interface between

---

**1.** Offshore Express has made no claim for the damages that its vessel incurred.

the gas and the water in the reservoir was in equilibrium prior to the collision, but was changed as a result of the collision and shut-in.

22.   Had this accident not occurred, it is more likely than not that the well would have continued producing until 1990.  This approximate date is based on the estimate that the well had 605 mmcf of recoverable gas reserves and 6776 bbles. of recoverable condensate left in the reservoir on March 24, 1986 and that the annual rate of decline of production from the well was approximately 20%.[2]

23.   The parties stipulated as to the gas prices which would have been received by the plaintiffs had they continued to sell gas from the Voisin Well on the spot market past March 24, 1986.  Taking the monthly production projections for the Voisin Well, multiplying them by the calorific value of the gas, and then multiplying by the gas price which the plaintiffs were receiving on the spot market for the pertinent month, yields the gross revenues which the plaintiffs would have received from the sale of gas and condensate throughout the life of the Voisin Well would have been in the gross amount of approximately $1,130,000.

24.   Deductions from the gross revenue include: (1) $2,800.00 per month, representing the properly allocable deduction for operating expense.  The monthly average operating expense was approximately $4400.  However, Pennzoil's fixed operational expenses (personnel, payroll expenses, etc) did not change as a result of the loss of the Voisin Well.  Since Pennzoil's ownership interest in the well was 37.21%, that amount is deducted from the average well operating expenses, leaving approximately $2,800.00 per month as the appropriate deduction.  (2) Also, it was agreed by all parties that 7 cents per mcf of gas and 12.5 percent of condensate revenue, representing the Severance tax is to be deducted from the plaintiffs' recovery.

25.   The repairs to the pipeline were not completed until April 16, three weeks after

the allision.   The delay in repairing the pipeline was due to United's decision to replace the entire pipeline using a "free stress" method of new construction as opposed to a more simplistic straight forward repairing of the break, leaving the pipeline in approximately the same configuration as was existent before the accident.

26.   During the three weeks of repairs, Pennzoil was aware that the Voisin Well could become incapable of flowing if kept shut-in for an extended period of time.

27.   Additionally, Pennzoil knew that the longer the well remained shut-in, the less the chances were that the well could be restored to production.

28.   The Voisin Well had the basic necessary equipment in place to flare gas.  Pennzoil's concerns relating to flaring dealt with the need for on-site facilities for personnel, safety concerns and environmental regulations.  This was a remote area.  Furthermore, permission to flare gas on a temporary basis is normally granted from the Department of Conservation in an emergency situation such as the one this incident posed for Pennzoil and Pennzoil could have provided a crew boat or jack-up rig to accommodate personnel during the flaring operation.

29.   Instead of taking action to flare the well, Pennzoil relied on the original and basically unsophisticated estimates of United Gas that the repairs would be performed within a few days.  Pennzoil continued to rely on these estimates even after the well had been shut-in for over two weeks.

30.   Pennzoil's decision to take no action during the entire three week period to attempt to place its well back on line by flaring the gas or taking other possible action, was not reasonable under the circumstances.

31.   After the pipeline was repaired, Pennzoil tried unsuccessfully to reflow the well.  The demise of Pennzoil's A.L. Voisin No. 1 Well was partially attributable to Pennzoil's failure to flare the well.

---

**2.**  Previous to this incident, an independent reserve estimator company did a reserve analysis for the Voisin Well which projected the amount

of recoverable reserves in the well as of January 1, 1986 to be 726 mmcf of gas and 7600 bbles. of condensate.

32. Had Pennzoil put the well back on line shortly after the casualty by flaring the gas, Pennzoil's damages would have been the costs associated with putting the well back on line, the loss of gas during the period that the pipeline was being repaired, and the costs associated with the flaring of the gas. It is more likely than not the total amount of loss and damages in these circumstances would have been in an amount of $150,000.

33. As a result of this casualty, United Gas suffered damage to its 12″ pipeline crossing the Houma Navigation Canal. United Gas chose to replace, rather than repair, its pipeline. United Gas' damages and the expenses that would have been incurred to repair its pipeline to the condition existent immediately prior to the casualty, would more likely than not, be in the amount of $150,000.[3]

34. United Gas also lost approximately 5,893 mcf of natural gas which escaped from the ruptured pipeline. The value of this gas was $15,688.

### CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction of this suit under its admiralty jurisdiction, 28 U.S.C. § 1333, and under the provisions of the Extension of Admiralty and Maritime Jurisdiction Act, 46 U.S.C. § 740.

■ 2. Contrary to the defendant's contentions, the plaintiffs' claims are not barred by the principles set out in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). *Robins* stands for the proposition that a plaintiff cannot recover for indirect economic loss. The doctrine does not apply when a party has suffered physical damages as in this case. *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217 (5th Cir.1985), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

3. Both *Robins* and *Louisiana ex rel Guste v. M/V TESTBANK*, 752 F.2d 1019

(5th Cir.1985), *cert. denied*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986), involved claims for temporary loss of use. The indirect economic losses suffered by those who brought claims in those cases are distinctly different from the kind of claim which Pennzoil has brought here. Pennzoil's claim is for the physical damage to and destruction of its well and reservoir, not for temporary loss of use or indirect economic loss.

■ 4. Although Pennzoil did suffer a physical loss, they failed to mitigate their damages. It is determined that Pennzoil's conduct was unreasonable and this unreasonable conduct had the consequence of aggravating the damage to the well. *Marathon Pipeline Company v. M/V SEA LEVEL II*, 806 F.2d 585 (5th Cir.1986).

■ 5. Since Pennzoil failed to mitigate their damages, their recoverable damages are limited to the cost associated with flaring the well, putting the well back on line and the loss of gas during the period that the pipeline was being repaired, which totals $150,000.

■ 6. United Gas breached its duty to keep its pipeline from becoming an obstruction to navigation in contravention of the requirements of 33 C.F.R. § 330.3 and 33 U.S.C. § 403. Its failure to take action to lower the pipeline, provide a protective cover, or mark the pipeline constituted negligence.

■ 7. The owners of obstructions must maintain and operate them so as not to impede navigation any more than is absolutely necessary, the right to navigation being paramount. *Santa Rosa Island Authority v. F. Rust Smith & Son, Inc.*, 303 F.2d 576, 580 (5th Cir.1962).

■ 8. Under the conditions of restricted visibility that were in existence on March 24, 1983, Captain Corey was negligent in not adjusting his speed and means of navigation accordingly.

---

**3.** Offshore's figure of $78,000 to repair the pipeline assumed that mechanical connectors could be used. Since United Gas had an all welded pipeline prior to the casualty, it is entitled to have its pipeline returned to an all welded condition.

9. Offshore Express was aware of the presence of the pipeline, of the fact that the Canal was in a low water stage on the night of March 24, 1986, and of the impaired visibility resulting from the fog conditions. An awareness of the risk of allision with the pipeline was sufficient to alert Offshore Express to the fact that wells upstream from pipeline would be affected by an interruption in flow.

10. Offshore Express is not entitled to limit its liability. A vessel owner can limit its liability only if the casualty was occasioned without its "privity or knowledge". 46 U.S.C. § 183.

11. Both defendants were negligent and liable to the plaintiffs in the following percentages: United Gas—50%, Offshore Express—50%.

Plaintiff's counsel shall prepare a judgment consistent with these findings and conclusions. Each party shall bear its own costs.