**PENNZOIL PRODUCING COMPANY, et al., Plaintiffs–Appellees Cross–Appellants,**

v.

**OFFSHORE EXPRESS, INC., et al., Defendant–Appellant Cross–Appellee,**

v.

**UNITED GAS PIPE LINE COMPANY, Defendant–Appellee.**

**UNITED GAS PIPE LINE COMPANY, Plaintiff–Appellee,**

v.

**OFFSHORE EXPRESS, INC., Defendant–Appellant.**

**No. 90–3276.**

United States Court of Appeals, Fifth Circuit.

Oct. 18, 1991.

James O.M. Womack, Andrew C. Wilson, Burke & Mayer, New Orleans, La., for defendant-appellant, cross-appellee.

Donald R. Abaunza, Liskow & Lewis, New Orleans, La., for Pennzoil, et al.

Charles R. Talley, Ernest L. Edwards, Jr., Lemle, Kelleher, Kohlme & Kellehery, New Orleans, La., for United Gas Pipeline Co.

Before JOHNSON, WIENER and BARKSDALE, Circuit Judges.

JOHNSON, Circuit Judge.

This case requires this Court to review a decision of the district court 735 F.Supp. 195, apportioning damages resulting from an allision of an offshore utility vessel with a natural gas pipeline. Finding no reversible error, we affirm the district court's judgment in all respects.

## I. Facts and Procedural History

The facts found by the trial court are as follows. On a dark and foggy night in March 1986 Captain Joseph Corey was at the helm of the M/V GREEN CANYON EXPRESS, a 185' utility vessel owned by Offshore Express, Inc. The vessel was proceeding north through the Houma Navigation Canal, towards Houma, Louisiana. Captain Corey had posted a lookout in the wheelhouse, but visibility was so restricted by the fog that the lookout could not see both banks of the canal at the same time. Accordingly, Captain Corey was navigating by radar, splitting the banks of the canal. Captain Corey knew the canal was at a low water stage, but he was not using his fathometer, and, the district court found, he was running at an imprudently high speed. It is not entirely clear why, but for some reason Captain Corey veered away from the canal's dredged deep water channel. At about 3:20 in the morning the vessel struck the DuLarge natural gas pipeline, owned by United Gas Pipeline Co., about 25' outside of the dredged channel. The pipeline ruptured, and the escaping gas exploded into flames.[1]

The DuLarge pipeline was constructed in the 1940s, well before the Houma Canal

---

1. United Gas' damages included the damage to its pipeline and the loss of the gas in the pipeline. The cost to restore the pipeline to its condition prior to the accident would have been approximately $150,000. United Gas, however, did not simply restore the pipeline to its pre-accident condition; it replaced altogether the portion of the pipeline under the canal, using a new method of construction. United Gas also lost about $15,000 worth of gas.

was built in 1961. The pipeline crossing has no permit from the Corps of Engineers; rather, the pipeline was retroactively authorized by a nationwide blanket permit for structures completed before December 18, 1968. That blanket permit requires that the authorized structures, including the DuLarge pipeline, present "no interference with navigation." 33 C.F.R. § 330.3(b). When the canal was first dredged in 1961 United Gas lowered the portion of the pipeline which was to pass beneath the dredged channel, and posted "Do not dredge" signs on the canal's original banks to warn of the existence of the pipeline. The original banks of the canal, however, have long since disappeared. The canal passes through marshland, and since its construction its banks have eroded significantly; as a result, the canal has widened considerably. Originally 150' across, by March 1986 the canal was 600' wide in places. Moreover, due to the erosion of the banks, the dredged channel—maintained 150' wide and 15' deep—does not consistently lie along the midline between the canal's banks. United Gas knew this, but never lowered the portions of the pipeline on either side of the dredged channel.

To protect it from damage by passing vessels, the pipeline was buried in the mud at the bottom of the canal. In October 1985 United Gas probed the depth of the pipeline to ascertain its location; at that time the pipeline was covered with about two feet of mud. Shortly after that probe, however, the U.S. Army Corps of Engineers dredged the channel. United Gas did not regularly inspect the pipeline, and the pipeline was not checked again after the dredging to see if it was still covered by mud. After the pipeline was ruptured by the M/V GREEN CANYON EXPRESS, portions of the pipeline were removed and were discovered to have barnacle growth around its entire circumference; since barnacles do not grow under mud, it was evident that the pipeline had not been buried. Also, an examination of the hull of the vessel indicated that when the vessel struck the pipeline, the pipeline was about four feet below the waterline, and the water is approximately five or six feet deep at that point in the canal. In light of all of these facts, the district court found it more likely than not that at the time of the allision the pipeline, which was about 12″ in diameter, was at least partly exposed above the mud line.

The damages caused by the allision of the vessel with the pipeline were not confined to the pipeline and the vessel. A nearby natural gas well, the A.L. Voisin No. 1 Well, owned by Pennzoil,[2] also suffered physical damage. When the pipeline ruptured and exploded, safety devices on the Voisin well, which was connected to the pipeline, sensed the drop in pressure and automatically caused the well to stop producing gas, or "shut-in." While this ordinarily might not have been a particularly troubling development, the Voisin well was "flow critical" or "rate sensitive," meaning that if the well remained shut in for an extended period of time it would not be possible to restart production. Pennzoil knew this. Nevertheless, in the three weeks it took United Gas to replace the pipeline, Pennzoil took no action to preserve the well even though it had on hand, at the well site, equipment which would have allowed it to "flare" the well. "Flaring" the well would have allowed Pennzoil to restart the well's production: rather than flowing the gas into the pipeline, it would be shunted as it came out of the well bore and burned off as it flowed out of the shunt pipe into the air a safe distance from the wellhead.

The district court found that Pennzoil could have flared the well legally and safely. Nonetheless, Pennzoil did not attempt to flare the well. If Pennzoil had flared the well, the district court found, its total losses would have been 1) the gas it burned off in the three weeks it took to replace the pipeline and 2) whatever costs were associated with flaring the well. These damages, the district court determined, would have amounted to $150,000. As it turned out, by the time the pipeline was replaced Pennzoil

---

**2.** The Voisin No. 1 Well was owned by several parties, including: Pennzoil Producing Company, ARCO, Mobil, Harry Bourg Corporation, John T. Velkas, and C.T. Carden. For the sake of simplicity, these parties will be referred to collectively as "Pennzoil."

was unable to resume production from the well, and lost proven reserves of gas worth about $1.1 million.

Pennzoil brought this action against Offshore Express. Offshore Express impleaded United Gas as a third party defendant. Pennzoil added a claim of its own against United Gas, and United Gas filed a claim against Offshore Express. All of the claims were consolidated, and the case was tried to the court. The trial judge held Offshore Express and United Gas each 50% at fault for the accident, but allowed Pennzoil to recover only $150,000 because of Pennzoil's failure to mitigate its damages. He also held that Offshore Express was not entitled to limit its liability to the value of its vessel. Offshore Express appeals, arguing 1) that the trial judge's findings as to the negligence of Captain Corey, the master of its vessel, were clearly erroneous and incorrect as a matter of law, 2) that United Gas was wholly at fault, 3) that Pennzoil cannot recover for damages to its gas well under the rule of *Robins Dry Dock*, and 4) that Offshore Express is entitled to limit its liability to the value of its vessel. Pennzoil cross-appeals, arguing 1) that the district court applied the wrong legal standard in reducing the amount of its recoverable damages, and 2) that the district court's findings of fact as to Pennzoil's failure to mitigate its damages were clearly erroneous. United Gas has not appealed.

## II. Issues Raised by Offshore Express' Appeal

### A. *Standard of Review*

■ It is well settled law that, as in most federal actions, in maritime actions the "clearly erroneous" rule applies to the review of the factual findings of the trial court. Thus we must accept the district court's findings of fact unless, upon reading the record and examining the exhibits, we are convinced that they are demonstrably incorrect. Fed.R.Civ.P. 52(a); *Candies Towing Co., Inc. v. M/V B & C ESERMAN*, 673 F.2d 91, 93 (5th Cir.1982).[3] To borrow a phrase from former Chief Judge John R. Brown, the findings of the district court in this case "float well above that Plimsoll Line." *Candies Towing*, 673 F.2d at 93. Each of the trial court's findings are well supported by the evidence.

### B. *Comparative Fault*

The central thrust of Offshore Express' argument to this Court is that United Gas, by failing to prevent its pipeline from becoming an obstruction to navigation, was at fault for this accident and should be held solely liable for it. Part of Offshore Express' position is undoubtedly correct. It certainly is true that United Gas was at fault. It failed to prevent its pipeline from becoming an obstruction to navigation as required by the blanket permit. The district court so found and held United Gas liable for the allision. United Gas has not appealed from that ruling; this Court need not and cannot reexamine it.

It certainly is *not* true, though, that because United Gas was at fault it must be held *solely* liable for the allision. For Offshore Express to advance such an argument is to overlook one of the most fundamental precepts of admiralty jurisprudence: in 1975 the Supreme Court held, in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), that damages in admiralty cases are to be apportioned on the basis of the comparative fault of the parties. Thus, the question before this Court is *not* whether United Gas was at fault, but whether the district court correctly held that Offshore Express was *also* at fault for the accident. If so, then the judgment against Offshore Express must be upheld. With the scope of the inquiry firmly fixed before us, we turn to the issues raised by Offshore Express.

### C. *The Fault of Offshore Express*

■ Offshore Express first contends that the district court committed clear error in finding that Captain Corey negligently conned the M/V GREEN CANYON EX-

---

**3.** Moreover, it is the function of the trier of fact (here, the trial judge) to weigh the evidence presented, judge of its credibility, and resolve disputes. Fed.R.Civ.P. 52(a); *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

PRESS. Offshore Express' argument is untenable. There was abundant evidence that Captain Corey had acted imprudently in navigating the canal, as the trial court's Finding of Fact # 19 recites:

> Captain Corey's conning of the vessel in such a manner as to cause the vessel to veer away from the deep water channel was negligent, in view of the fact that he was proceeding underway with markedly restricted visibility, made no use of the vessel's fathometer and/or spotlight, and proceeded at a speed greater than was prudent under the circumstances.

735 F.Supp. at 197. Given that Captain Corey knew of the existence and location of the pipeline,[4] there can be no question that Captain Corey's decision to proceed up the canal in the fog without using his spotlight or fathometer, and without posting a lookout in the bow, constituted negligence.

■ In addition, the district court found that Captain Corey was proceeding "at a speed greater than was prudent under the circumstances." It is well settled that the use of radar does not relieve a pilot of the obligation to proceed at a safe speed. *Standard Oil Co. of California v. S.S. Rotti*, 286 F.Supp. 677, 679 (N.D.Cal.1967), *aff'd*, 398 F.2d 835 (9th Cir.), *cert. denied*, 393 U.S. 980, 89 S.Ct. 448, 21 L.Ed.2d 441 (1968). Moreover, "it is negligent for a vessel to be underway at all if her minimum speed is greater than that which would permit a complete stop within the limits of visibility." *Williamson Leasing Co., Inc. v. American Commercial Lines, Inc.*, 616 F.Supp. 1330, 1340 (E.D.La.1985). Thus, even though the testimony showed that the speed of the M/V GREEN CANYON EXPRESS was "dead slow," the district court could properly have found that this speed was imprudent. That is, there are occasions on which the conditions are difficult or unfavorable enough that the

only prudent course is to heave to and wait for safe navigation to again become possible. *See Williamson*, 616 F.Supp. at 1340 n. 16. *See also Barrois Bros., Inc. v. Lake Tankers Corp.*, 188 F.Supp. 300, 303 (E.D.La.1960), *aff'd*, 286 F.2d 573 (5th Cir. 1961) ("The [vessel's] speed was ... immoderate.... If she could not proceed at a slower speed in the fog because of the current, then she should not have been underway in the first place."). Given that the district court found that visibility was markedly restricted on the night of the accident, this Court cannot say that it is clearly erroneous to hold that Captain Corey should have heaved to and waited for conditions to improve.

■ Despite the district court's findings, Offshore Express argues that as a matter of maritime law the facts found by the district court do not permit a conclusion that Offshore Express was at fault for the allision. In particular, Offshore Express argues that on a navigable waterway the right to navigation is paramount, and that Captain Corey had a right to use the full width of the canal, including areas outside the dredged channel. Offshore Express contends that by allowing its pipeline to become an obstruction to navigation, United Gas bears sole responsibility for the accident. Once again, Offshore Express is only partly correct. It is certainly true that the right to navigate is paramount, and that those who place objects in, under, or over a waterway must do so in a way that does not interfere with navigation, including navigation outside a dredged channel. *E.g.*, *Santa Rosa Island Authority v. F. Rust Smith & Sons, Inc.*, 303 F.2d 576, 580 (5th Cir.1962) ("It is incumbent upon the owner of the bridge that it be so constructed as to readily admit the passage of craft...."). Offshore Express is incorrect, however, to assert that this right of navigation is wholly unfettered: when a mariner knows of obstructions to navigation, he must avoid them. *E.g.*, *Mid–America*

---

**4.** It is undisputed that Captain Corey knew of the pipeline and its location. He admitted in his deposition that he was familiar with the Houma Navigation Canal, having travelled through it on numerous occasions over a period of 15 years. He was aware that the banks of the canal had eroded over the years, he had seen the pipeline warning signs, and he was aware

that United Gas' pipeline crossed the canal just north of the Dulac Pontoon Bridge. The pipeline is shown on the standard nautical chart for the Houma canal. In light of all of these facts, it certainly was not error for the district court to conclude that "Offshore Express was aware of the presence of the pipeline." 735 F.Supp. at 200.

*Transp. Co. v. Nat'l Marine Serv., Inc.,* 497 F.2d 776, 779 (8th Cir.1974) ("if the object in the channel be known, and nevertheless struck, [the vessel's] negligence may be presumed"); *AT & T Co. v. Steuart Transp. Co.,* 1978 A.M.C. 1680, 1690 (D.Md.1977) (where "the general location of the [submerged] cables and the navigation channel was known, it was simple negligence to allow the tug and barge to approach so near the shallows"). A pilot simply does not have the right to roam at will from bank to bank, running down whatever known hazards may lie in his path.

■■■ Moreover, when a moving vessel strikes a stationary object outside the channel, she is presumed to be at fault. *Delta Transload, Inc. v. M/V NAVIOS COMMANDER,* 818 F.2d 445, 449 (5th Cir.1987). As Judge John Minor Wisdom has explained, "[t]he presumption of negligence is usually well justified:"

> Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient ... to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testimony of the witnesses, what was done was too little or too late, or if not, then the vessel was at fault for being in a position in which an unavoidable collision would occur.

*Delta Transload, Inc.,* 818 F.2d at 449–450 (quoting *Patterson Oil Terminals, Inc. v. The Port Covington,* 109 F.Supp. 953, 954 (E.D.Pa.1952)). While this presumption generally does not apply to allisions with sunken or hidden objects, "knowledge of an otherwise nonvisible object warrants imposition of presumed negligence against those operating the vessel who possessed this knowledge." *Id.* at 450. Thus, it is appropriate to erect this presumption of fault against Offshore Express, and in light of the facts found by the district court—that Captain Corey was proceeding at an imprudent rate of speed, failed to use his fathometer and spotlight, and negligently caused his vessel to veer away from the ship channel—Offshore Express has not and cannot overcome it. In sum, Offshore Express simply has no room to argue that the district court erred, either on the facts or the law, when it found that Captain Corey negligently conned his vessel.[5]

### D. *The Rule of* The Pennsylvania

Offshore Express next argues that notwithstanding the finding that Captain Corey was negligent, maritime law—in particular, the rule of *The Pennsylvania* [6]—operates to render United Gas solely responsible for the allision. This argument has no merit. Offshore Express misconstrues the rule of *The Pennsylvania;* correct application of the rule is in no way inconsistent with the district court's judgment.

■■■ Named for the case in which it was laid down, *The Pennsylvania* rule states that when, at the time of a collision, a ship

> is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it *could not have been.*

5. The Court notes as well that the district court could very properly have concluded that Captain Corey was negligent on other grounds. In particular, the evidence makes clear that Captain Corey violated the master's continuing duty to know where his vessel is at all times. *Mid–America Transp. Co.,* 497 F.2d at 780. *Also cf. Mac Towing Inc. v. American Commercial Lines,* 670 F.2d 543, 546–47 (5th Cir.1982) (duty to ascertain current and understand its effect on vessel). Although not specifically set out in the district court's opinion, the facts found by the district court admit of only two possible conclusions: either 1) Captain Corey did not know that he had left the dredged channel (and therefore *did not know where his vessel was),* or 2) Captain Corey knew he had left the channel, but proceeded ahead anyway, knowing that the river was at a low water stage and that a natural gas pipeline crossed the canal in his vicinity. Whichever of these conclusions is the correct one, it establishes Captain Corey's negligence.

6. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

86 U.S. at 136 (emphasis added). The rule allocates the burden of proof, transfering it to the party in violation of a statute or regulation. If that party is to escape liability for the loss, it must prove not just that its violation probably was not, but in fact could not have been a cause of the collision. *See Candies Towing Co., Inc. v. M/V B & C ESERMAN*, 673 F.2d 91, 93 (5th Cir. 1982) (the rule of *The Pennsylvania* "constitutes an evidentiary rule reversing the burden of proof"); Grant Gilmore & Charles L. Black, *The Law of Admiralty* § 7–5 (2d ed. 1975).

Although application of the rule imposes a heavy burden of proof, that is all that it does. It does *not* determine a party's ultimate share of liability for a loss. *Otto Candies, Inc. v. M/V MADELINE D*, 721 F.2d 1034, 1036 (5th Cir.1983). Accordingly, this Court has repeatedly held that *The Pennsylvania* rule has survived the Supreme Court's adoption of a comparative fault scheme for maritime matters. As former Chief Judge Brown has put it, "[the] rule still floats, in the wake of *U.S. v. Reliable Transfer*, which only overruled *The Pennsylvania* on the point of allocating comparative fault." *Allied Chem. Corp. v. Hess Tankship Co.*, 661 F.2d 1044, 1052 (5th Cir.1981) (citation omitted). *See also United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1116 (5th Cir.1985) ("the Rule was not altered by the advent of comparative negligence in admiralty").

Although in its original form the rule of *The Pennsylvania* applied only to collisions between ships, it has been extended in this Circuit to apply to a variety of maritime accidents and to parties other than vessels. *E.g., Nassau Marine Corp.*, 778 F.2d at 1116 ("The [*Pennsylvania*] Rule does not apply only to collisions."); *Candies Towing*, 673 F.2d at 93–94. Thus, the rule has been reformulated to apply to any "statutory violator" who is a "party to a maritime accident." *Sheridan Transp. Co. v. United States*, 834 F.2d 467, 476 (5th Cir.1987) (*Sheridan I*), *appeal after remand*, 897 F.2d 795, 799 (5th Cir.1990) (*Sheridan II*). In particular, the rule has been applied "not only to ships, but also to those who do not properly mark an object in navigable waters." *Gele v. Chevron Oil Co.*, 574 F.2d 243, 247 (5th Cir.1978).

■ Offshore Express complains on appeal that the district court erred in failing to apply the rule of *The Pennsylvania* to United Gas. Offshore Express points out that United Gas violated its pipeline permit by failing to prevent the pipeline from becoming an obstruction to navigation and that the district court found that United Gas' failure to keep its pipeline from becoming an obstruction to navigation had contributed to the accident. Thus, Offshore Express concludes that United Gas necessarily could not have carried its burden to prove that its pipeline could not have been a cause of the accident, and therefore must be held 100% liable for the loss.

The rule of *The Pennsylvania* does not produce such a result. As noted above, the rule merely allocates a burden of proof; it does not fix liability. If a party fails to carry the burden imposed on it by the rule, the rule does not require that party to bear 100% of the responsibility for the allision. Liability still must be apportioned according to the comparative fault of the parties, as mandated by the Supreme Court's landmark ruling in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). "The rule of *The Pennsylvania* concerns only the burden of proof for showing causation; it does not determine ultimate liability for damages." *Sheridan I*, 834 F.2d at 478. Accordingly, even if it was error for the district court to fail to apply *The Pennsylvania* rule to United Gas, the error was harmless, as the district court went on to find that United Gas and Offshore Express were equally responsible for the allision and to apportion damages accordingly. *See Florida E. Coast Ry. Co. v. Revilo Corp.*, 637 F.2d 1060, 1067 (5th Cir. Unit B 1981) (affirming judgment in which trial court found statutory violation and applied *The Pennsylvania* rule, concluding that the violator had not carried its burden and should be held liable for 80% of the damages sustained).

### E. Pennzoil's Damages and the rule of Robins Dry Dock

In *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309, 48 S.Ct. 134, 135,

72 L.Ed. 290 (1927), Mr. Justice Holmes wrote for the Court that

> as a general rule, ... a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong.

Despite stiff criticism and several potent challenges, the principal announced by Justice Holmes survives to this day; it is the law in this Circuit that a plaintiff in an admiralty case cannot recover negligently inflicted economic losses where there is no physical damage to any property in which the plaintiff has a proprietary interest. *State of Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1020 (5th Cir. 1985) (*en banc*), *cert. denied*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). Offshore Express urged the district court and urges this Court to apply the Fifth Circuit's version of *Robins Dry Dock* to the facts of this case. Offshore Express argues that Pennzoil had no proprietary interest in the damaged pipeline and that there was no physical damage to the Voisin well. Thus, Offshore Express concludes that Pennzoil's only losses are economic and unrecoverable.

■ Offshore Express' argument has no merit. The rule of *Robins Dry Dock* was never intended to apply to cases in which the plaintiff has suffered some physical damage to property in which he has a proprietary interest, and *M/V TESTBANK* did not extend the rule to such cases. Indeed, almost immediately after the Fifth Circuit reaffirmed the rule of *Robins Dry Dock* in *M/V TESTBANK*, the Court plainly held that in those cases in which a plaintiff suffers *physical damage* to some property in which it has a proprietary interest, the rules of *Robins Dry Dock* and *M/V TESTBANK* do not apply. *Consolidated*

*Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217, 1222 (5th Cir.1985), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). That is, if a plaintiff has a claim for more than simple loss of use of some facility due to the tort of some third party, its claim is not barred by *Robins Dry Dock*. *Id.*

■ There is no question here that Pennzoil suffered physical damage to property in which it had a proprietary interest. The district court correctly found that the structural changes in the Voisin well caused by the allision and rupture of the pipeline constituted physical damage to the well. Accordingly, the district court correctly held that *Robins Dry Dock* did not apply to this case and correctly allowed Pennzoil to recover for the physical damage to the Voisin well.[7]

### F.   Offshore Express' Right to Limit its Liability to the Value of its Vessel

■ Offshore Express next contends that it should have been entitled to limit its liability under the maritime Limitation of Liability Act, which allows the owner of a vessel to limit its liability for any loss or injury involving the vessel to the value of the vessel and its freight. 46 U.S.C. § 183(a).[8] As the statute indicates, a party is entitled to limitation only if it is "without privity or knowledge" of the cause of the loss. *Id.; see also Patton–Tully Trans. Co. v. Ratliff*, 797 F.2d 206 (5th Cir.1986). In this context, a shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition. *In the Matter of Texaco, Inc.*, 570 F.Supp. 1272, 1278 (E.D.La.1983). Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they

---

7. Pennzoil argues in the alternative that, for purposes of the rule of *Robins Dry Dock,* it has a proprietary interest in the pipeline, so that it may recover for damages which proximately result from the allision with the pipeline. Because we hold that Pennzoil can recover for the physical damages to the Voisin well, we need not address this argument.

8. Section 183(a) provides:

(a) The liability of the owner of any vessel, whether American or foreign, ... for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
46 U.S.C. § 183(a).

should have known with respect to conditions or actions likely to cause the loss. *Verdin v. C & B Boat Co.*, 860 F.2d 150, 156 (5th Cir.1988); *Patton–Tully*, 797 F.2d at 211. Finally, the burden is on the party seeking limitation to establish that it did not have knowledge or privity of the negligent activity or unseaworthy condition that caused the accident. *Patton–Tully*, 797 F.2d at 211.

■ Offshore Express has not met that burden here. There was substantial evidence before the district court to show that one Gerald Hoffman, Vice President and General Manager of Offshore Express, knew that masters of Offshore Express vessels operated those vessels in fog and that on occasion accidents had resulted. Hoffman's knowledge of this history of operation in conditions of reduced visibility is precisely the sort of knowledge of shore-based managing officials that vitiates the right to limit. *See Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir.1977). The district court correctly denied Offshore Express' petition to limit its liability.

On the whole, Offshore Express has identified no infirmity in the district court's judgment. The district court properly found 1) that Offshore Express was partially responsible for the allision, due to Captain Corey's negligence, 2) that the rule of *Robins Dry Dock* did not bar recovery by Pennzoil, and 3) that Offshore Express was not entitled to limit its liability. There is no basis on which to reverse any of these findings or conclusions, and the judgment against Offshore Express must be affirmed. The only remaining questions are those raised by Pennzoil's cross appeal.

### III. Issues Raised by Pennzoil's Cross Appeal

A. *The Doctrine of Avoidable Consequences and Pennzoil's Responsibility to Mitigate its Damages*

■ In its cross appeal Pennzoil argues at some length that the district court committed legal error when it reduced Pennzoil's recoverable damages—from just over $1.1 million to $150,000—on the basis of Pennzoil's failure to mitigate its damages. Pennzoil argues that the district court's reliance on the doctrine of avoidable conse-

quences was misplaced, as that doctrine is not compatible with, and has not survived the adoption of, the general rule of comparative fault employed in maritime cases. Pennzoil's argument, while facially plausible, ultimately has no force.

The leading statement of the doctrine of avoidable consequences in this Circuit comes—not surprisingly—from an opinion by former Chief Judge Brown. In *Southport Transit Co. v. Avondale Marine Ways, Inc.*, 234 F.2d 947 (5th Cir.1956), Judge Brown explained that under the doctrine of avoidable consequences,

> a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them.

*Id.* at 952. Judge Brown went on to explain that the doctrine of avoidable consequences is really a rule of damages, and that as such it stands wholly apart from the rules that determine who is at fault for the initial injury. That is, unlike contributory negligence, which occurs *before* any wrongdoing,

> [t]he doctrine of avoidable consequences comes into play at a later stage. Where the defendant has *already* committed an actionable wrong, whether tort or breach of contract, then this doctrine limits the plaintiff's recovery by disallowing only those items of damage which could reasonably have been averted.... [T]he doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration.

*Id.* (emphasis added).

Pennzoil contends, however, that the doctrine of avoidable consequences is incompatible with a scheme of comparative liability, and therefore was vitiated by the Supreme Court's decision in 1975 that liability in maritime causes of action is to be apportioned on the basis of comparative fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Pennzoil is able to point to some confusion in the cases in support of its

argument that the doctrines of comparative fault and avoidable consequences cannot co-exist. Properly understood, however, the two doctrines are not at all inconsistent, as Judge Rubin carefully explained:

> Courts have often referred to a so-called duty to mitigate damage, but there is no such duty, for there is no correlative right upon its violation. There is instead a method of apportioning damages between the parties where the injured party has, *subsequent to infliction of the harm,* failed to exercise that degree of care society demands of the reasonable person.
>
> The consequences of such post-injury negligence—*as distinguished from negligence contributing to the harm and acting as a bar to recovery*—is to deny to the negligent victim damages "for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them." *Southport Transit Co. v. Avondale Marine Ways,* 234 F.2d at 952.

*Tennessee Valley Sand & Gravel Co. v. M/V DELTA,* 598 F.2d 930, 932–33 (5th Cir.1979) (emphasis added) (citations omitted). Thus, the two doctrines serve different functions and may peacefully co-exist: when determining who shall be liable for what in the wake of some loss, the court employs the rule of avoidable consequences to determine what damages are recoverable, and looks to the comparative fault scheme of *Reliable Transfer* to determine the portion of the recoverable damages each party must pay.

The district court properly applied both of these doctrines to the facts before it. The district court determined that United Gas and Offshore Express were equally responsible for the initial injury and held them both 50% liable, as required by the doctrine of comparative fault. The district court also applied the doctrine of avoidable consequences, finding that Pennzoil's *post-injury* conduct was unreasonable and that it caused a loss that could have been averted. The district court quite properly refused to allow Pennzoil to recover for that portion of its loss.

### B. *Pennzoil's Failure to Flare the Well*

In order to successfully invoke the doctrine of avoidable consequences to limit a plaintiff's recovery, the defendant must show both 1) that the plaintiff has acted unreasonably after the injury has occurred, and 2) that the plaintiff's unreasonable actions aggravated his damage. *Tennessee Valley Sand & Gravel,* 598 F.2d at 933. The district court concluded that Offshore Express and United Gas had shown both of these elements. Nonetheless, in the face of this finding, Pennzoil contends that Offshore Express and United Gas did not carry their burden of proving that Pennzoil's failure to flare the well caused the loss of the well.

Initially, there is some dispute as to the proper standard of review of the district court's determination that Pennzoil's conduct aggravated its damages. The district court recorded its determination that Pennzoil's conduct aggravated its damages as a "Conclusion of Law" rather than a "Finding of Fact."[9] Pennzoil contends that because of the label the district court's determination was a legal one and therefore is reviewable *de novo.* Pennzoil places undue weight on this label: it is

---

9. The district court's Conclusion of Law # 4 states:

4. Although Pennzoil did suffer a physical loss, they failed to mitigate their damages. It is determined that Pennzoil's conduct was unreasonable and this unreasonable conduct had the consequence of aggravating the damage to the well. *Marathon Pipeline Company v. M/V SEA LEVEL II,* 806 F.2d 585 (5th Cir.1986).

735 F.Supp. at 199.

This determination that Pennzoil's conduct aggravated its damages rests in part on Finding of Fact # 32, which states:

32. Had Pennzoil put the well back on line shortly after the casualty by flaring the gas, Pennzoil's damages would have been the costs associated with putting the well back on line, the loss of gas during the period that the pipeline was being repaired, and the costs associated with the flaring of the gas. It is more likely than not the total amount of loss and damages in these circumstances would have been in an amount of $150,000.

*Id.* In Finding of Fact # 23 the district court calculated that the loss to Pennzoil due to the death of the well was approximately $1,130,000. *Id.* at 198.

clear that in making out a defense of failure to mitigate, it must be shown as a *factual* matter that the plaintiff's conduct was unreasonable and aggravated its damages, and the trial court's finding to that effect here, however labeled, should be treated as such.

Reviewing only for clear error, then, the district court's determination must be upheld.[10] There was substantial evidence before the court indicating that Pennzoil knew that the well was "flow critical" or "rate sensitive" and that the longer the well was shut in the greater was the possibility that the well would be lost. Nonetheless Pennzoil refused for three weeks to flare the well, even though Pennzoil had the necessary equipment on hand and could have accomplished the procedure safely and legally. While environmental regulations generally prohibit flaring of wells, the district court noted that exceptions are often granted in emergencies and that an exception would likely have been granted to Pennzoil. Moreover, even if an exception would not have been granted, the district court could properly have concluded that Pennzoil was negligent in failing even to request permission to flare its well.

In sum, Pennzoil's arguments that it should have been allowed to recover the full value of the lost well are not well taken. The district court properly found that Pennzoil could have done more to avoid the loss of the well, and under the doctrine of avoidable consequences, Pennzoil may not recover for losses of its own making.

IV. Conclusion

The judgment of the district court is affirmed in all respects.

AFFIRMED.

---

**10.** The Court notes that even if the district court's conclusion were reviewed *de novo,* the result would not differ. That is, the law would permit no conclusion other than the one the district court reached.