CITY OF PORTLAND, a municipal corporation, Appellant,

v.

LUCKENBACH STEAMSHIP COMPANY, Inc., a corporation, and THE SS MARINE LEOPARD, Appellees.

No. 13914.

United States Court of Appeals Ninth Circuit.

Dec. 14, 1954.

Alexander G. Brown, City Atty., Ferris F. Boothe, David R. Williams, Deputy City Attys., Portland, Or., for appellant.

Wood, Matthiessen, Wood & Tatum, Erskine Wood, Lofton L. Tatum, John R. Brooke, Portland, Or., for appellees.

Before HEALY, POPE, and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

We are here concerned with the collision of the "Marine Leopard", a large cargo vessel of Luckenbach Steamship Co., Inc., respondent, cross-libellant and appellee, with the boom of a gantry crane owned and maintained by the City of Portland, Oregon, libellant-appellant, on its municipal paving dock along the Willamette River at Portland.

We list seriatim pertinent facts most of which are undisputed:

1.  The collision occurred in daylight late on the afternoon of June 22, 1952. The day was clear.

2.  At Portland, the Willamette River flows from south to north. The docks with which the case is concerned parallel the river along its east bank, and ships tie in parallel to the docks and the river. The Luckenbach dock is upstream or south of Portland's paving dock. The two are adjacent but not contiguous.

3.  The function of Portland's gantry crane is to unload gravel from barges. The crane travels on a track on the dock and parallel to the river. When the boom of the crane is up it would be difficult to see how it could obstruct anything moving in the river. When the boom is down it extends 50 feet over the river or 35¾ feet beyond the established harbor line and over or above navigable water of the United States.

4.  At the time of the collision, Portland's boom had been in a down position either continuously, or most of the time, for about two and a half years. At least, it had been down continuously for a year preceding the event which gave rise to this case. The crane was as far north as it could go and still stay on its tracks. These conditions were well known to the master and the pilot of the Marine Leopard. The crane was electrically operated. The electrical system was or had been

undergoing repairs and on June 22, 1952, was not in condition to operate the crane. The reason the boom had been down so long does not seem to be satisfactorily explained.[1] It seems that "up" had originally been the ordinary position of the boom when not in use.

5. The moving of the ship in the river was accomplished by the Marine Leopard's own engines with the assistance of the medium tug, Hulda. The ship was moving or being moved downstream to a municipal dock on the west side of the river. The bow of the ship was upstream and the stern was downstream. Upstream and forward of the bow, barges were tied in at the Luckenbach dock. Generally, the movement across the river and downstream was a backing one, stern first. The vessel was 525 feet in length. The crane (not the boom) was as far away from the Marine Leopard as it could be on Portland's dock.

6. Late in the afternoon when the collision occurred, the water in the river was about 12 feet above low water mark. This is described as "high water" due to tidal backing up from the Pacific into the Columbia and its tributary, the Willamette. The current was negligible.

7. As the movement of the Marine Leopard began, the Hulda had its line around the stern of the former. The cargo vessel's bow was described as "very high". The stern was low. This was due to the placing of the cargo. We take it that the ship was not fully loaded. The tug pulled the vessel's stern into the river, but difficulty was experienced in getting the bow out.

8. While backing, the vessel has a tendency to cant to port, which was the side of the ship which was alongside of the Luckenbach dock or the east bank of the river. While attempting to get away from the Luckenbach dock, and out into the river, the Marine Leopard sagged astern into the boom of Portland's crane. Substantial damage was done to the bridge and the forward mast, and to the crane. Some of the damage occurred while the vessel was moving forward attempting to extricate itself. After the collision, the Hulda worked its way between the vessel and Portland's dock and pushed the bow of the ship out into the river.

Portland sued first and so became the libellant and Luckenbach became the cross-libellant for the damage to the ship.

In their claims, each party asserted the negligence of the other. There is no issue here as to the amount of damage. The trial court held Portland solely responsible and entered an interlocutory decree fixing the entire responsibility upon Portland and Portland appeals.

Much of the trial below was concerned with whether the boom of the gantry crane in its static condition constituted an unauthorized obstruction to navigation under 33 U.S.C. § 403, 33 U.S.C.A. § 403, which reads as follows:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or com-

---

1. The actual electrical work began on the crane in April preceding the June collision. Representatives of the company making the repairs in effect testified that most of the repairs on the crane could have been made with the boom in the upright position but that such a position would have required that the work be done under unfavorable conditions. Under the evidence, the trial court was entitled to treat these repairs as immaterial and, in view of the evidence of long continuance theretofore of the boom in the down position, treat the boom while the controls were being repaired as a continuance of the same old obstruction and to say that what had become unlawful without excuse had not become lawful by the fortuitous circumstance that repairs were being made on or about the day of the collision. Too, it may have thought the boom in a down position such a hazard that Portland had a duty to repair the crane under unfavorable conditions.

mence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, * * * of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of Army prior to beginning the same. (Mar. 3, 1899, c. 425, § 10, 30 Stat. 1151)."

Portland had no Federal permission, if required, to leave its crane sticking out over the water. The trial court held the boom as it extended over the river was an unauthorized obstruction under the statute. But as we read the findings and conclusions, the court nevertheless would have found Portland entirely responsible on negligence and causation without the determination that the obstruction was unlawful.

We have carefully gone over the evidence in the case. In the moving of the Marine Leopard away from Luckenbach's dock there was considerable thrashing around in the water done by the vessel and the tug. From some of the uncontroverted evidence reasonable men might draw conflicting conclusions. The City of Portland had experts who maintained stoutly that Captain Jacobsen, pilot at the time on the Marine Leopard used wrong procedures the day in question.

Portland's two experts each had a different method than that used by Captain Jacobsen. The record is such that had the trial court found that Luckenbach was wholly responsible we would not disturb its conclusion. Without the aid of the trial court's findings, we might find Luckenbach wholly responsible or maybe equally so. If we were thrown on our own, we do not say that we would do so.

■ Appellant points out that our consideration of the case is de novo in accordance with the traditions of admiralty. But in our consideration of the case, we find evidence to support the trial judge's conclusion that Portland was negligent, and that Luckenbach was not negligent. Portland relies heavily on the last clear chance to avoid the accident being in Luckenbach. But one is not involved in the doctrine of last clear chance if one has a finding that on the occasion the party, against whom it was asserted, was not negligent at any time. Last clear chance means more than that in the course of events "A" had the last possible chance to avoid an accident because "B" did something negligently yesterday, and what "B" did yesterday was at the moment of the collision beyond recall.[2]

■■ In civil cases we do not set aside findings unless clearly erroneous. In admiralty, an appellate court at least should have a strong feeling or a firm belief of error (which we take to admit of something short of clearly erroneous) before presuming to substitute its judgment for that of the trier of the facts. The trial court is entitled to a prima facie presumption of the correctness of its findings.[3] This court had no opportunity to observe the demeanor of the witnesses which may have strongly and properly influenced the trial judge.[4]

2. We have not considered and do not deem it necessary here to consider the applicability of the last clear chance doctrine to admiralty.

3. See The President Madison, 9 Cir., 91 F. 2d 835.

4. Portland's two experts look fine on paper. Maybe they didn't look so good to the trial judge as he saw them in the witness box.

On the whole, after going over the entire testimony, we think that the question of negligence and the related matters of causation and last clear chance were very close questions. Assuming that Luckenbach had the burden of proof, the evidence taken favorably in behalf of Luckenbach, supports the trial judge. Close as the questions on the facts seem to be, we have no firm conviction or definite belief that he was wrong. Therefore, we do not disturb his findings.

We doubt it not that if the boom of the gantry crane were kept when not in active use in a vertical position, which seems to be its natural place of repose, and if the boom were lowered only for unloading operations or for temporary repairs there would have been no violation of 33 U.S.C. § 403, 33 U.S.C.A. § 403. But here with a showing that the normal condition of the boom for two and a half years, when not in use, had become that of a jutting extension into the river, we conclude that such was enough permanency to bring the thing within the prohibition of the statute. At least the trial judge was entitled to so find. Electrical repairs seem to have been the excuse for the boom being down on the day of collision. If the trial court had found that actual repairs necessitated keeping the boom down so long, then it might have been justified in finding it not within the prohibition of the statute. (Nonetheless, without the statutory violation, it still might have concluded that during the time of necessary repairs, Portland could have discharged its duty of care by tying a barge or barges under the jutting boom.) It was entitled to find here that the temporary condition had achieved such a permanence of repose as to violate the statute. We draw an analogy from a log. The log, floating, does not come within the statute. Turn it on end and drive it into the river. We have a violation of the statute. Of the cases cited by the parties we find no particular conflict therein. We think

the case closest to the facts of the Marine Leopard's collision is F. S. Royster Guano Co. v. Outten, 4 Cir., 266 F. 484. It supports appellee.

Portland cites Seaboard Airline R. Co. v. Pan American Petroleum & Transport Co., 5 Cir., 199 F.2d 761, and insists it is determinative of the whole Marine Leopard affair. The two cases do have many similarities in facts. In the Seaboard case a vessel called the "Pan American", while plying the Savannah River, struck a pier of the railroad's bridge in the channel. There was shoaling around the piers. The piers were in bad shape and may have produced the shoaling. But the structure as built and as modified from time to time had always been as to all construction properly approved by the government agencies with jurisdiction over the bridge. However, in 1946, the War Department of the United States had ordered modification of the bridge. The changes ordered apparently would have given a ship more clearance between piers as it moved under the bridge. But further governmental gamuts had to be run and the renovation of the bridge was not officially authorized until four years later in 1950.[5] Meanwhile the Pan American had collided with the bridge. In those circumstances we cannot see how Seaboard violated the statute.

As we read the Seaboard case, there the Court of Appeals for the Fifth Circuit considered, as it had a right to do, that the management of the vessel in the river at the time of the collision and immediately before was negligent. In its view, the trial court's findings that there was negligence of Seaboard and none of the pilot of the ship were clearly erroneous. At least the Court of Appeals was certain that justice lay in the opposite direction. It was convinced that negligence lay with the Pan American and there alone. As to Seaboard, there was certainly a good excuse for the

5. Also, the "offending pier", No. 4, was not ordered removed until after the Pan American collided with it. In the approved final plans, pier No. 4 came out.

bridge being in the condition it was. It violated no law.

In Marine Leopard, if we were convinced of the fault of Marine Leopard according to admiralty law, this court would upset the judgment below.

Not being so convinced, the judgment is

Affirmed.