74 F.3d 1240
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ALGOMA CENTRAL CORP., Plaintiff-Appellant,
v.
MICHIGAN LIMESTONE OPERATIONS, a limited partnership,
Defendant-Appellee.
 No. 94-1917.
 United States Court of Appeals, Sixth Circuit.
 Jan. 22, 1996.
 
 Before: LIVELY, NELSON and SUHRHEINRICH, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 The Great Lakes bulk carrier M/V ALGOSTEEL ran aground while departing Port Calcite Harbor, in Lake Huron, on April 11, 1992. The ALGOSTEEL is owned by the plaintiff, Algoma Central Corporation (Algoma). The defendant Michigan Limestone Operations (Michigan Limestone) conducts business at Calcite Harbor, and loads vessels with its products at a slip situated at the inland end of the harbor. After the grounding, Algoma sued Michigan Limestone, claiming that the grounding of the ALGOSTEEL and the resulting losses were caused by Michigan Limestone's failure to maintain a channel from the harbor entrance to the loading slip to a width of 300 feet and a depth of 26 feet.
 
 
 2
 Following a five-day bench trial the district court found that the defendant did not fail to perform any duty owed to the plaintiff and that navigational errors by the ALGOSTEEL's master caused the ship to run aground. After a careful review of the record, we affirm the judgment of the district court.
 
 I.
 A.
 
 3
 Calcite Harbor is protected on the north by a breakwater and is open on the south. The entrance to the harbor is marked by a flashing red light at the Lake Huron end of the breakwater. There is a channel within the harbor that the parties agree runs on a bearing of 236? inbound and 056? outbound. They also agree that there is a green light range, running on these same bearings that marks the approximate center of the channel. The green range is customarily used by ships leaving the harbor. Several witnesses testified that they lined up the stern of departing vessels on the two green lights of the range. The depth of the channel was reported in 1975 as 26 feet in an inset contained in Chart 14864, published by the National Oceanic & Atmospheric Administration (the NOAA Chart). (The listing of 26 feet indicates that depth above a fixed level known as the "low water datum"). Beyond these matters, the parties agree on very little.
 
 
 4
 Contrary to the plaintiff's contention that the channel width is 300 feet, the defendants maintain that the channel is and always has been 200 feet wide. The loading slip at the inland end of the harbor consists of two parallel docks with 185 feet of water between them. The parties appear to agree that a line extended at 056? to the harbor entrance from the face of the north dock marks the north boundary of the channel, but they sharply disagree as to the location of the south boundary. The defendant asserts that the south boundary of the channel is located 15 feet south of the face of the south dock, and extends to the harbor entrance in a line parallel to the northern boundary. This would constitute a 200 foot wide channel. The plaintiff, on the other hand, relies on a line of red lights (the red range) approximately 97 feet south of the face of the south dock as establishing the southern boundary of the channel. The red range runs at a bearing of 236? for incoming vessels and thus is parallel to the green range, which marks the approximate center line of the channel. Treating the red range as the south boundary would produce a channel approximately 282 feet wide.
 
 B.
 
 5
 On April 10, 1992 the ALGOSTEEL arrived at Calcite Harbor empty. She entered the Calcite channel stern first, berthed at the north dock, and began loading a cargo of crushed limestone. At 11:45 p.m. on April 10, the first officer determined that the water level was 1 foot 6 inches above the low water datum. This reading indicated a clearance of approximately 27 feet 6 inches. Calcite Harbor's loading foreman told the ALGOSTEEL's captain that other vessels had loaded to a draft of 26 feet in similar conditions. The ALGOSTEEL was then loaded to a draft of 25 feet 8 inches, which produced a draft of 25 feet 10 inches forward, 25 feet 11 inches midship, and 25 feet 10 inches aft, once the ship was underway, taking into account "squat" and "detention." Due to severe weather during the night of April 10th, the ALGOSTEEL did not leave until the morning of April 11. The ALGOSTEEL's captain did not confirm the water level prior to leaving. The ALGOSTEEL departed, bow first at approximately 8:05 a.m. The captain called for right full rudder to leave the north dock. At this time the wind was blowing in from 100? at 17 knots and the captain feared that the wind might "set" the ALGOSTEEL to the north. As the ship pulled away from the north dock, the captain set a course of 061? , moving the ship toward the south side of the harbor. He maintained this 061? course until the ship's stern cleared the south dock. At this time the captain ordered the helmsman to come slowly left to a heading of 056? . When the ship was about two and one-half ship lengths (1825 feet) from the end of the south dock, and still coming to 056? from 061? at 4 to 5 knots, the ALGOSTEEL ran aground.
 
 
 6
 The captain was unable to free the ship by putting its engines all astern full, and eventually it was necessary to offload its cargo into another vessel before it floated free and was removed to a dry dock for repairs.
 
 C.
 
 7
 Algoma brought this action against Michigan Limestone for the cost of repairing the ALGOSTEEL and for lost revenue and expenses incurred during the repair period. Algoma claimed that Michigan Limestone committed negligence and breach of warranty in failing to comply with an Army Corps of Engineers' permit to dredge the harbor for a 300 foot wide channel to a controlling depth of 26 feet below water datum, failing to locate and remove uncharted and unknown obstructions in the navigational channel on a periodic basis, failing to warn Algoma of the inaccuracy of published navigational charts, and generally failing to provide a safe means of ingress and egress to the berths in Calcite Harbor. Michigan Limestone denied the allegations, claiming that the grounding was due solely to the captain's navigational errors, that the ALGOSTEEL was outside of the channel at the time of the grounding, and, alternatively, that the ship struck a known "high spot"--an area with a shallower depth than the general stated depth of the channel.
 
 
 8
 In its memorandum opinion, the district court made several specific factual findings on the boundaries and dimensions of the Port Calcite channel and the location of the ALGOSTEEL at the time of the grounding. The district court stated "[t]he [Calcite Harbor] channel is marked by two lighted ranges" and "[t]his [c]ourt is satisfied from the testimony presented ... that the actual width of the channel was 200 feet," as depicted on the NOAA Chart. The district court found "the northern boundary of the channel appears to be a line parallel to the face of the north dock and the southern boundary appears to be 200 feet to the south, at approximately the line of the red range." The court noted, however, "there is considerable dispute as to the exact location of the line of the 'red range.' " The court determined the red range was "at, or very close to, the south edge of the NOAA channel." The court also noted "the location where the ship ran aground was at, or very close to, the south edge of the channel." The court further stated the ALGOSTEEL "may well have been outside the channel" at the time of the accident.
 
 
 9
 In addition, the court determined that Algoma had not proven that the vessel had, in fact, struck an uncharted obstruction. The district court found the uncharted obstruction, consisting of a rock 2 1/2 to 3 feet in diameter, which Algoma claimed damaged the ALGOSTEEL, was located 25-30 feet south of the location of the grounding, was "on the southern edge of the channel," and could not, due to its physical characteristics, have caused the damage to the ALGOSTEEL. The court further determined that Michigan Limestone had neither breached duties owed to Algoma nor failed to exercise reasonable care. The court specifically found Michigan Limestone did not have a duty to conduct annual soundings of the channel and that the failure to conduct annual soundings was not the proximate cause of the damage to the ALGOSTEEL.
 
 
 10
 Based on its factual determinations, the court concluded that the cause of the accident was the captain's failure to take into consideration the effect on the water level of the strong overnight winds that had reached 35 knots. The court further found that the captain deliberately piloted the ALGOSTEEL farther south than was appropriate and maneuvered the ship into an area where there was insufficient clearance despite the fact that he knew there were "high spots" in the southern portion of the channel.
 
 
 11
 On appeal, Algoma argues that three of the district court's findings of fact are clearly erroneous. The three challenged findings are: (1) the dimensions of the navigational channel and the location of the vessel in relation to the channel at the time of the grounding; (2) that Michigan Limestone did not breach any duty owed to Algoma; and (3) that the failure of Michigan Limestone to sound the channel annually was not a proximate cause of the damage to the ALGOSTEEL.
 
 II.
 
 12
 Applying the clearly erroneous standard to a district court's findings of fact, this court must give due regard to the district court's ability to judge the credibility of witnesses and to understand the entire setting of the case. Further, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). This court recently applied the clearly erroneous standard in an admiralty case in which one of the district court's bases for its judgment was questionable while the other basis was clearly correct. We affirmed, holding that "a reviewing court can sustain the judgment of a lower court on any ground that finds support in the record." In re Cleveland Tankers, Inc., 67 F.3d 1200, 1205 (6th Cir.1995) (quoting United States v. Anderson County, 761 F.2d 1169, 1174-75 (6th Cir.), cert. denied, 474 U.S. 919 (1985)).
 
 
 13
 With these principles in mind, we now consider Algoma's arguments in the order presented.
 
 III.
 A.
 
 14
 There is a conflict between the district court's finding that the Calcite Harbor channel was 200 feet wide and that the red range marked its southern boundary. This is so because the red range was located about 82 feet beyond a line 200 feet south of the north boundary of the channel. Because of this inconsistency, the district court mistakenly described the site of the grounding as at or near the south boundary of the channel, as marked by the red range. If the grounding occurred at or near the red range, that would place the grounding at a spot approximately 82 feet south of a 200 foot wide channel, not at or near the south boundary of a 200 foot wide channel.
 
 
 15
 Most of the evidence indicated that the channel is 200 feet wide. That is the width to which Michigan Limestone's predecessor maintained the channel. Further, several witnesses testified that the width was 200 feet. The evidence concerning the red range is confusing. It is listed in several publications as establishing the course for incoming vessels and making an alignment along the south side of the channel. More than one witness indicated that the purpose of the red range is to put vessels on the proper course as they turn into the harbor from Lake Huron. In fact, the captain of the ALGOSTEEL testified that in entering Calcite Harbor he relied on the red range "[t]o start with." He stated positively that he did not rely on the red range going out, and no other ship's captain testified that he relied on that range in departing. In fact, the captain stated that the red range does "not mark the south edge of the channel." Thus, it does not appear that the red range actually marked the southern boundary of the channel. Rather, its purpose was to put ships on the correct course, 236? , as they turned in from Lake Huron, but not to prescribe a course to be followed once within the harbor.
 
 B.
 
 16
 We conclude that the conflict between the district court's findings with respect to the width of the channel and the location of its southern boundary is not significant. The district court recognized the imprecision within the record concerning the southern boundary of the channel. The court did not base its conclusion that the captain was negligent on a finding that the grounding occurred outside the channel. In fact, the court said only that the ALGOSTEEL "may well have been outside the channel" when it ran aground.
 
 
 17
 The district court squarely based its finding that navigational error caused the grounding and injuries suffered by Algoma on the captain's own testimony. The captain testified that he did not recheck the water level on the morning of April 11, even though there had been a gale warning and strong winds throughout the night. Instead, he relied on the reading taken the night before he departed. Other witnesses testified that strong winds can affect water level in a harbor such as Calcite. In fact, a reading taken at 9:30 a.m. on April 11, after the grounding, indicated that the water level was lower than it had been at 11:45 the previous night. Although he did not check the gauge to determine if the storm had changed the water level, the captain did consider the effect of the wind at the time of departure, and deliberately steered south of his usual course after clearing the south dock in order to compensate for any "set" to the north resulting from a 17 knot wind from his starboard side. He testified on cross-examination, however, that the ship was not affected by the wind, as he had feared it might be, before it went aground.
 
 
 18
 Choosing not to line up on the mid-channel green range and steer his usual 056? course, the captain took the ship to the south side of the channel. He testified that he did not consult the NOAA Chart, the United States Coast Pilot, or II Canadian Great Lakes Pilot on April 10 or 11, though he had them aboard. Nor did he review the sounding charts. Instead, he relied on his knowledge of the harbor from previous trips in and out of Calcite Harbor and the fact that the "dock people" told him on April 10 that two other ships had departed safely, one loaded to 26 feet and one to 25 feet 8 inches. Thus, he loaded the ALGOSTEEL to 25 feet 8 inches and departed without rechecking the water level on April 11. Most significant, however, was the captain's testimony that he knew there were high spots or shallow areas in both the north and south portions of the channel and that he intended to take the ship into an area of known high spots. No other witness agreed with his claim that there were high spots at mid-channel, and the district court clearly rejected this testimony.
 
 
 19
 The district court specifically found one of the defendant's experts, Joseph H. Winer, to be a credible witness. Mr. Winer, a consulting engineer and marine surveyor, testified that he had reviewed documents referred to and introduced as exhibits at the trial and various depositions. In addition, he had inspected the Calcite Harbor facilities to see personally the berths within the slip, the channels, the landmarks, and other surrounding items. This witness stated that he had located the place where the ALGOSTEEL went aground based on a Canadian Coast Guard report, which contained bearings taken from the wheelhouse with LORAN-C, and on confirming photos taken while the ship was still aground. Although Algoma attacked the accuracy of the witness's determination because of LORAN-C's margin of error, it failed to produce any better evidence of the location of the grounding.
 
 
 20
 Mr. Winer testified that the "forward starboard" of the vessel extended into a 24-foot depth contour line shown on the NOAA chart. To the north of that contour line, he testified, the depth was more than 24 feet and to the south it was less than 24 feet. The starboard side of the ship ran aground; one plaintiff's witness, a diver who went down to examine the damage, testified that from about the midship area of the starboard side forward the ship was "up tight" against the bottom.
 
 
 21
 Another witness, Captain Owens, a Great Lakes master, testified that "local knowledge" of Calcite Harbor held that a captain should never let the starboard side of his ship drop below the line-up of the face of the south dock. According to the best evidence heard by the district court the starboard side of the ALGOSTEEL was approximately 97 feet south of that line when she ran aground. Captain Owens also testified that a reasonably prudent captain would not take a vessel loaded to a draft of 25 feet 8 or 10 inches to the south of the channel because of the 24 foot contour line referred to by Mr. Winer.
 
 
 22
 Based on the nature of the grounding--the entire ship from midship forward was tight to the bottom--and the evidence that the rock claimed to have caused the grounding was some 25 to 30 feet south of where the ship went aground, the district court rejected the plaintiff's claim that the ALGOSTEEL came to grief by striking an uncharted hazard, "the rock." There was ample evidence to support the district court's finding that the captain took his ship too far south and came to rest on a high spot consisting of a limestone layer less than 24 feet below the surface. Because that depth was shown on a sounding chart that the captain admitted he had not consulted even though he acknowledged knowing there were high spots south of the center of the channel, it was immaterial whether the grounding occurred within or without the channel. There is a presumption of negligence on behalf of a ship's captain where the vessel strikes a stationary object. Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 794-95 (5th Cir.1977); Delta Transload, Inc. v. M/V Navios Commander, 818 F.2d 445, 449 (5th Cir.1987). A charted obstruction is the equivalent of a stationary object such as a navigational aid. Algoma failed to rebut this presumption. Furthermore, "it is the duty of the [vessel] to ... establish that she was in the channel and did not hit a known obstruction therein...." Mid-America Transp. Co., Inc. v. National Marine Serv., Inc., 497 F.2d 776, 780 (8th Cir.1974), cert. denied, 425 U.S. 937 (1976). Algoma did not meet this burden of proof.
 
 
 23
 The district court also noted that between 400 and 500 ships had entered and left Calcite Harbor in the three sailing seasons between 1990 and 1992 without any reported problems with the depth of the channel. If the ALGOSTEEL had departed on the green range--that is, with her stern in line with the two green lights--on a heading of 056? , the court found that she would have cleared the harbor safely as all the other vessels had.
 
 
 24
 Viewed in its entirety, the record supports "the district court's account of the evidence." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). Furthermore, even though there appears to be a conflict, caused we must note by the failure of the plaintiff to introduce a reasonably large scale chart of Calcite Harbor, between various items of evidence concerning the width of the channel and the location of the red range, we find ample support in the record to sustain the district court's ultimate finding as to the cause of the grounding.
 
 IV.
 
 25
 Algoma argues that Michigan Limestone breached its duty as a wharfinger to investigate and learn of the existence of the rock that Algoma claims caused the damage to the ALGOSTEEL. In view of our agreement with the district court's finding that the ALGOSTEEL went aground on a limestone outcropping rather than by striking "the rock," little response is needed to this argument.
 
 A.
 
 26
 Algoma makes the more specific argument that Michigan Limestone had a duty to survey the channel annually to determine whether heavy weather or a dragged anchor might have churned up boulders or other obstructions not previously noted. This position is based largely on the fact that prior to Michigan Limestone's purchase of the Calcite facility from United States Steel Corporation (U.S. Steel) in 1987, U.S. Steel had made annual soundings of the harbor. U.S. Steel's soundings were made using 20 foot square centers. In 1988, after Michigan Limestone purchased the facility, a survey company made a detailed hydrographic sounding survey. In the channel and area around the docking berths, the surveyor utilized 10 foot, rather than 20 foot, square centers. This use of smaller squares produced more accurate information. Michigan Limestone provided sounding charts based on this survey to all shipping companies using Calcite Harbor, including Algoma.
 
 
 27
 Following completion of the 1988 survey, Michigan Limestone decided to discontinue annual soundings of the channel. The annual soundings had shown very little change, and all evidence indicated a very stable bottom in the channel and berthing area. Furthermore, Michigan Limestone had received no complaints from the owners or masters of the hundreds of ships that had entered and left the harbor over the years. The district court found that Michigan Limestone had no duty to conduct annual soundings. The court also found that even if the ALGOSTEEL had grounded by striking the rock identified by Algoma, the plaintiff had failed to carry its burden of proving that annual soundings would have disclosed the rock's presence. These findings are not clearly erroneous.
 
 B.
 
 28
 Michigan Limestone is a "wharfinger." Under admiralty law a wharfinger owes certain duties to vessels using its facilities. The seminal case on the duty of a wharfinger is Smith v. Burnett, 173 U.S. 430 (1899). In that case, the Supreme Court held:
 
 
 29
 [a]lthough a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths. At the same time the master is bound to use ordinary care, and cannot carelessly run into danger. Smith v. Burnett, 173 U.S. at 433 (citations omitted).
 
 
 30
 There is sufficient probative evidence in this record to support the district court's finding that Michigan Limestone neither breached any duty it owed to Algoma nor failed to exercise reasonable care. The court specifically credited Mr. Winer's testimony that the rock identified by the plaintiff could not have caused the damage to the vessel. In addition, the court relied on other evidence that annual soundings would not likely have disclosed the rock. Liability of the wharfinger for this grounding could not be based on Michigan Limestone's decision to discontinue soundings given the district court's fully supported finding that the sole proximate cause of the incident was the captain's navigational errors. In addition, the 1988 sounding chart showed shallow water or high spots in the area where the ALGOSTEEL went aground, yet the captain chose to steer south of his usual line of departure from Calcite. Algoma offers no explanation, other than the rock theory, as to why later annual soundings would have supplied more information. Thus, the district court's ultimate finding--that the captain's deliberate decision to take his vessel south of mid-channel into an area of known "high spots" was the proximate cause of the grounding--is not clearly erroneous.
 
 V.
 
 31
 Algoma's third claim of clear error largely consists of a rehash of its contentions in support of its second argument. Again, it argues that Michigan Limestone breached its duty as a wharfinger. Algoma maintains that, having applied for and received a permit from the Army Corps of Engineers in November 1987 to dredge and maintain a 300 foot wide channel to a depth of 26 feet at Calcite Harbor, Michigan Limestone was required to do precisely what the permit allowed.
 
 
 32
 Algoma relies on the "Pennsylvania Rule." In The Pennsylvania, 86 U.S. (19 Wall) 125 (1874), the Supreme Court laid down a rule, described as follows in Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465 (5th Cir.1991), "[T]hat when, at the time of a collision, a ship 'is in actual violation of a statutory rule intended to prevent collisions ... the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.' " Id. at 1471 (quoting The Pennsylvania, 86 U.S. at 136 and adding emphasis).
 
 
 33
 Algoma argues that Michigan Limestone violated the Army Corps permit, and this violation shifted to Michigan Limestone the burden of proving that the grounding could not have been caused by its failure to dredge and maintain a channel 300 feet wide and 26 feet deep. This argument has no merit.
 
 
 34
 The permit contained no mandatory language. Rather, the document did exactly what its name implies; it allowed Michigan Limestone to dredge and maintain such a channel and directed where the dredged material should be dumped. Algoma produced no evidence in support of its position. On the other hand, Gary R. Mannesto, chief of the Regulatory Functions Branch of the United States Army Corps of Engineers, testified by deposition that the permit did not mandate or require that the permittee dredge a channel 300 feet wide to a depth of 26 feet. There was no evidence to the contrary. Thus, Michigan Limestone did not violate the permit by failing to do all the permit allowed. Cases cited by Algoma involve entirely different scenarios having no relevance to the simple grounding at issue here.
 
 CONCLUSION
 
 35
 Upon the basis of the entire record, we are convinced that the district court did not commit clear error in finding that the cause of the ALGOSTEEL's grounding was the captain's navigational error.
 
 
 36
 AFFIRMED.