*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BESSEMER & LAKE ERIE RAILROAD
COMPANY and THE PITTSBURGH AND
CONNEAUT DOCK COMPANY,
　　　*Plaintiffs-Appellees/Cross-Appellants,*

　　　　　*v.*

SEAWAY MARINE TRANSPORT, UPPER LAKES
SHIPPING LTD., UPPER LAKES SHIPPING INC.,
and UPPER LAKES GROUP INC., a/k/a JACK
LEITCH UPPER LAKES SHIPPING *In Personam*,
and the MOTOR VESSEL CANADIAN
ENTERPRISE *In rem*,
　　　*Defendants-Appellants/Cross-Appellees.*

> Nos. 08-4676/4678

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-02392—Patricia A. Gaughan, District Judge.

Argued: November 19, 2009

Decided and Filed: February 25, 2010

Before: NORRIS, CLAY and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Brian J. Miles, D'LUGE, MILES, MILES & CAMERON P.L.C., Mount
Clemens, Michigan, for Appellants. Richard A. Dietz, FOSTER, MEADOWS &
BALLARD, P.C., Detroit, Michigan, for Appellees. **ON BRIEF:** Brian J. Miles, D'LUGE,
MILES, MILES & CAMERON P.L.C., Mount Clemens, Michigan, for Appellants. Richard
A. Dietz, Camille A. Raffa Dietz, A. Poppy Goudsmit, FOSTER, MEADOWS &
BALLARD, P.C., Detroit, Michigan, for Appellees.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.  When the Enterprise, a large cargo ship, positioned itself to receive a load of coal on the shores of Lake Erie, it struck a land-based coal-loading machine operated by Bessemer & Lake Erie Railroad Company and The Pittsburgh & Conneaut Dock Company.  Bessemer and its affiliate filed this admiralty action against the Enterprise and its owners and operators, Seaway Marine Transport, Upper Lakes Shipping Inc. and Upper Lakes Group Inc., seeking recovery of repair costs and lost profits.  The district court granted Bessemer summary judgment as to liability, finding Seaway and its affiliates wholly at fault.  When it came to damages, the district court awarded $522,000 in cost-of-repair damages to Bessemer but determined that Bessemer did not adequately disclose the basis of its lost-profits claim and thus granted Seaway summary judgment on that claim.  We affirm the district court's rejection of Bessemer's lost-profits claim but reverse in part as to liability, finding a genuine dispute of fact over Bessemer's comparative negligence.

I.

*The shiploader.*  Bessemer owns and operates several docks on the coast of Lake Erie in Conneaut, Ohio.  Ships arrive at Dock 3 to receive loads of coal from the dock's shiploader, a large, land-based steel structure.  Conveyor belts transport coal from silos to the shiploader,  and a part of the shiploader known as the boom—a steel, drawbridge-like apparatus—lowers from its upright storage position to extend horizontally across the ship receiving the load.  A chute hangs from the boom and deposits coal in the ship's hatches.

Shiploader operators employed by Bessemer control the movement of the boom and the chute.  An operator initially lowers the boom from its vertical stowed position using controls in a small compartment in the shiploader.  After positioning the boom over the ship, the operator walks out across the boom and enters the operator's cab, which is suspended from the center of the boom.  From inside the cab, the operator adjusts the angle of the chute and controls the dispensing of coal into the ship.  The operator also has some control over

the boom, with in-cab controls that allow the operator to raise the boom by as much as fifteen degrees.

*The Enterprise.* Seaway operates the Enterprise, a 730-foot cargo ship, which has twenty-two hatches for storing coal. On its deck near the stern, it has a 250-foot-long self-unloading boom, a crane-like device that allows the ship to unload its own cargo. On-deck controls allow the crew to swing the self-unloader to either side of the vessel.

*The incident.* In October 2005, the Enterprise pulled into Dock 3 to receive a load of coal from the shiploader. Captain Frederick Penney secured the ship and turned control over to First Mate Louis Drolet, who coordinates the loading process. With the boom extended across the ship and shiploader operator James Fertig in the cab, the shiploader emptied coal into hatch five, which is near the bow of the vessel. The loading plan then called for the shiploader to empty coal into hatch fourteen, located midship, which required the ship to move forward 210 feet to align hatch fourteen with the boom and the chute. Because the ship's self-unloader obstructs access to hatch fourteen when it is in a resting position, the crew swung the self-unloader to the side of the ship away from the dock before beginning the shift.

With the self-unloader off to the ship's side, Drolet radioed Fertig and asked for permission to shift the ship, which Fertig granted. The crew began to move the boat slowly, with Drolet using controls at the bow, Wheelsman Jim Donnelly using controls at the stern and two deck hands handling the ship's wires from the dock. Drolet could not see the self-unloader from his location, and Donnelly acknowledges that he was looking at the controls, not the self-unloader. Fertig watched the ship move beneath him from his cab suspended over the deck of the ship. He faced forward with the shiploader behind him, and he had windows in front of and behind him but watched the ship only from the front windows. Throughout the maneuver, Fertig counted off the distance the ship needed to travel and radioed the distances to Drolet.

With about 45 feet to go, the ship's self-unloader struck the shiploader's boom, causing damage to the boom, which took five weeks to repair. Bessemer sued, alleging that the ship's crew negligently failed to swing the self-unloader out far enough to clear the

shiploader's boom. Relying on the rule of *The Oregon*, 158 U.S. 186 (1895)—a rebuttable presumption that, when a moving object strikes a stationary object, the moving object is at fault—the district court granted summary judgment on liability, holding Seaway solely responsible for the incident and entitling Bessemer to $522,605.73 in cost-of-repair damages. At the same time, however, the district court found that Bessemer had failed to comply with Civil Rule 26's requirement that it produce documents supporting its claim for lost profits damages. In view of Bessemer's noncompliance with Rule 26, the court excluded evidence of lost profits under Civil Rule 37(c)(1) and granted summary judgment on the lost-profits claim to Seaway. Seaway appeals the liability ruling, and Bessmer appeals the lost-profits ruling.

## II.

As to liability, Seaway concedes that it bears some fault for what happened, but it argues that it should not be held solely to account for the accident. Seaway principally claims that the district court misapplied the *Oregon* Rule's presumption of fault and failed to account for genuine issues of fact concerning Bessemer's comparative negligence.

## A.

Admiralty law draws a distinction between allisions and collisions. An allision occurs when a moving vessel strikes a stationary object, and a collision occurs when two moving vessels strike each other. *See Fischer v. S/Y NERAIDA*, 508 F.3d 586, 589 n.1 (11th Cir. 2007). (An elision occurs when lawyers mistakenly lump the two concepts together.) The *Oregon* Rule applies to allisions, establishing a rebuttable presumption that, when a moving object hits a stationary object, the moving object is at fault. *See The Oregon*, 158 U.S. at 197; *see also Superior Constr. Co. v. Brock*, 445 F.3d 1334, 1339 (11th Cir. 2006). In their appellate papers, the parties primarily square off over whether the *Oregon* Rule applies—Seaway claiming that the rule does not apply because Bessemer's movable boom is not a stationary object and Bessemer insisting that simply because the boom *can* move does not show whether it was stationary at the time of the incident.

But the outcome of this case does not turn on this distinction or for that matter on whether the *Oregon* Rule applies. Not unlike the doctrine of *res ipsa loquitur*, the *Oregon*

Rule creates a *prima facie* case of negligence, not a final case of sole negligence. *See In re Mid-South Towing Co.*, 418 F.3d 526, 532 n.6 (5th Cir. 2005); *see also* Thomas J. Schoenbaum, 2 Admiralty and Maritime Law § 14-3, 104–05 (4th ed. 2004). Based on "the common-sense observation that moving vessels do not usually [a]llide with stationary objects unless the vessel is mishandled in some way," the rule presumptively allocates fault when the circumstances of an allision are unknown—requiring the party most likely to know what happened (the moving vessel) to present evidence to rebut the presumption of fault. *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572 (7th Cir. 2004). But when "the parties have introduced evidence to dispel the mysteries that gave rise to the presumption," the *Oregon* Rule has no factual void to fill. *In re Mid-South Towing*, 418 F.3d at 531.

That is true here, as Seaway has admitted some negligence, but not full responsibility, for the accident. What matters then is not whether the vessel bears some responsibility for the accident. It admits that it does. The question is whether, even if the vessel was negligent, may it still shift some responsibility for the accident to the dock owner due to its alleged comparative fault? The answer to that question does not turn on the *Oregon* Rule. *Cf. id*.

Perhaps as a result of the way the parties briefed the case, the district court took the view that, once it determined that the *Oregon* Rule's presumption of fault applied to this case, Seaway had to "rebut the presumption" of fault before it could consider Seaway's comparative negligence defense. R.45 at 16. When Seaway could not do so, the court found Seaway solely liable for the accident.

That is not how the *Oregon* Rule works. It is a burden-shifting doctrine, "not a rule of ultimate liability." *City of Chicago*, 375 F.3d at 572. While it may be the case that a moving vessel must rebut the presumption to absolve itself of *all* liability, *id.* at 573, we know of no case law to the effect that the vessel must rebut the presumption to relieve itself of *some* liability—that is, to raise a comparative fault defense against the stationary object. "[T]he *Oregon* Rule . . . speaks explicitly only to a presumed breach on the part of the alliding vessel, and is not a presumption regarding either the question of causation . . . or the percentages of fault assigned parties adjudged negligent." *In re Mid-South Towing Co.*, 418

F.3d at 532; *accord Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 212 (2d Cir. 2009).

Were it otherwise, the moving vessel could *never* raise a comparative fault defense. Once the *Oregon* Rule is triggered, the moving vessel has three ways to rebut *all* liability: "(1) the allision was actually the [sole] fault of the stationary object; (2) the moving vessel acted with reasonable care; or (3) the allision was the result of an inevitable accident." *City of Chicago*, 375 F.3d at 573. No matter which of these routes the vessel takes, all of them require the vessel to prove it bore *none* of the fault. That leaves the moving vessel in an all-or-nothing-at-all position. If it cannot rebut the presumption, that puts it completely at fault. And if it can rebut the presumption, that makes it completely fault free. Either way, the approach leaves no room for a *comparative* negligence defense. Yet comparative and contributory negligence not only are venerable doctrines in general, but they also turn on principles that have centuries of relevance in the context of admiralty law. *See* Rolls of Oleron, Article XIV (circa 1150 A.D.) (fault should ordinarily be apportioned between moving vessel and stationary object), *contained in* Schoenbaum, 3 Admiralty and Maritime Law 118 *and cited with approval by United States v. Reliable Transfer Co.*, 421 U.S. 397, 402 n.3 (1975). "The rule in admiralty, when property damage results from a[n] [a]llision . . . between ship and shore, is comparative negligence." *Bhd. Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 325 (7th Cir. 1993). It would be odd, we think, to transform a modest evidentiary presumption into a rule that wiped away a longstanding tradition of shared fault in allision cases.

*City of Chicago* does not support a different rule. After finding that the moving vessel had not rebutted the *Oregon* Rule's presumption, *City of Chicago apportioned* damages between the moving vessel and the stationary object based on the stationary object's comparative fault. *See* 375 F.3d at 578–80.

B.

Seaway also challenges the district court's alternative conclusion that, even if the vessel was entitled to prove comparative fault without rebutting the *Oregon* Rule, there was no triable issue of fact over Bessemer's comparative negligence. Seaway raises three

theories of comparative fault: (1) that Bessemer did not show that it had a proper permit for the boom, suggesting it was an illegal obstruction to navigation; (2) that the boom, even if authorized by permit, became a "*de facto* obstruction to navigation" during the loading process, Seaway Br. 15; and (3) that factual issues remain over whether Bessemer should have moved the boom out of the ship's way or checked to see whether the self-unloader would clear the boom. We consider each in turn.

1.

Federal law prohibits "build[ing] . . . any wharf, pier, . . . boom . . . or other structure[]" without a permit from the United States. 33 U.S.C. § 403. Yet, as Seaway points out, the only permit that Bessemer has produced authorizes "two steel sheet pile cells to support a coal conveyor system," not the boom itself. *See* R.44-3 at 7. In the absence of the requisite permit for the boom, Seaway says, Bessemer would be negligent as a matter of law.

A statutory violation, it is true, may provide a basis for negligence. *See Phillips Petroleum Co. v. Stokes Oil Co.*, 863 F.2d 1250, 1254–55 (6th Cir. 1988); *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873) (placing burden on the party in breach of a navigational statute to prove that its violation could not have been a contributing cause). But if the statutory violation did not affect the allision, a party's noncompliance does not factor into the apportionment of fault. *See Folkstone Mar. Ltd. v. CSX Corp.*, 64 F.3d 1037, 1047 (7th Cir. 1995) (describing ways to rebut the presumption of fault against the party in breach of a navigational statute).

Here, we cannot say (and Seaway has not argued) that the statutory violation, if any, proximately caused the allision. The Enterprise pulled into Bessemer's docks *so that* the boom could lower over the vessel and load coal into its hatches. There is no reason to think that the absence of a permit for the boom affected this sequence of events. When § 403 supplies a premise for liability, that is normally because the violation involves unauthorized and unattended machinery extended over the water with "enough permanency to bring [them] within the prohibition of the statute." *See City of Portland v. Luckenbach S.S. Co.*, 217 F.2d 894, 898 (9th Cir. 1954) (city positioned a crane over the water in violation of its

permit and left it there for more than a year); *F.S. Royster Guano Co. v. Outten*, 266 F. 484, 487 (4th Cir. 1920) (illegal obstruction of navigation to extend a crane "over the navigable water" "while not in use"). When, by contrast, a temporary obstruction occurs as a necessary part of the loading process, that is not the kind of obstruction that § 403 was designed to prevent. *See City of Portland*, 217 F.2d at 898 ("If the boom . . . were lowered only for unloading operations . . . there would have been no violation of 33 U.S.C. § 403."). Because Bessemer's alleged noncompliance was not a contributing cause of the allision and because the damage was not the kind the statute was designed to prevent, *see Folkstone*, 64 F.2d at 1047, the district court properly rejected this theory of comparative fault as a matter of law.

2.

Seaway adds that, even if § 403 does not supply a basis for liability, the boom became a "*de facto* obstruction to navigation" when Bessemer left it positioned inappropriately over the Enterprise while the vessel completed its shift. Seaway Br. 15–19. In support, Seaway points to three cases where a moving vessel recovered damages for striking machinery that obstructed its path across a waterway. *See City of Portland*, 217 F.2d 894; *Royster Guano*, 266 F. 484; *Consolidated Rail Corp. v. M/V Lagada Beach*, 1983 A.M.C. 1242 (E.D. Pa. 1982). But all of these cases involved machinery left extended over the waterway while not in use and with a sufficient degree of permanency to become an obstruction to navigation. *See Consolidated Rail*, 1983 A.M.C. 1242, R.42-9 at 4 (finding owner of a crane negligent for "allowing the operator's cab to extend, when in a stowed position" over the water); *City of Portland*, 217 F.2d at 897; *Royster Guano*, 266 F. at 487. An obstruction-to-navigation theory of liability does not apply where the alleged obstruction was a temporary, anticipated and necessary part of the loading process.

Worse, *Royster Guano* and *City of Portland* found liability primarily on the basis of a demonstrated violation of § 403, which has not been shown here. *City of Portland*, 217 F.2d at 898; *Royster Guano*, 266 F. at 486 (violation of predecessor statute to § 403, U.S. comp. Statutes 1916, Sec. 9910). Nor does *City of Portland* alternatively hold that, even in the absence of a statutory violation, an inappropriately extended crane can become a "de facto obstruction to navigation." Contrary to Seaway's argument, the court speculated that the *district court* "would have found Portland entirely responsible" even without a statutory

violation and noted that it might not have arrived at the same conclusion.  217 F.2d at 897.
*Royster Guano*, for its part, theorized that "even if [the crane] had [not violated the
permitting statute], it would have been . . . an obstruction to navigation," but based its
holding on a proven statutory violation.  266 F. at 487.  In the end, the only *holding* Seaway
has to support its theory that a stationary object can become an "obstruction to navigation"
absent a § 403 violation is a factually dissimilar district court case involving a crane
extended over navigable water while not in use.  *See Consolidated Rail*, 1983 A.M.C. 1242,
R.42-9 at 4.  The district court properly rejected this theory of comparative fault.

3.

That does not end the matter.  As the operator of a dock, Bessemer had a duty to
provide safe facilities to vessels using its facilities.  *Smith v. Burnett*, 173 U.S. 430, 433
(1899); *see also Algoma Cent. Corp. v. Michigan Limestone Operations*, No. 94-1917, 1996
WL 23214, at *7 (6th Cir. Jan. 22, 1996).  And in this instance Bessemer's alleged
noncompliance with its own internal operating procedures establishes a material issue of fact
over whether Bessemer met this standard of care.  *See In re City of New York*, 522 F.3d 279,
283, 288 (2d Cir. 2008) (ferry boat's internal rules bear on the "reasonable care under the
circumstances").

Bessemer's internal operating procedure required "shiploader operators . . . to raise
the boom . . . each time a vessel shifts to a compartment that is immediately adjacent to or
in close proximity to any vessel structure which would come in contact with the shiploader
chute, boom, cab, and/or etc."  R.44-9.  Bessemer personnel acknowledged that the self-
unloader was part of the Enterprise's "vessel structure" and that the internal rule suggests
that the operator had some responsibility to ensure that the boom would not contact the self-
unloader.  The record, moreover, contains sufficient evidence to create a dispute over
whether Fertig's decision not to raise the boom was a proximate cause of the allision.  Fertig
acknowledged at his deposition that raising the boom high enough to avoid the Enterprise's
self-unloader was feasible and "maybe" would have avoided the accident.  *See* R.42-2 at 66.
The parties, to be sure, spar over whether the rule applies to the self-unloader, with Bessemer
insisting that Seaway has somehow taken the statements from Bessemer personnel regarding

the rule's applicability out of context.     But that debate is one for the trier of fact, not for us, to resolve.

Seaway adds that some of the fault belongs to Bessemer because Fertig did not check to see whether the self-unloader would clear the boom before the maneuver began. According to First Mate Drolet, the vessel must receive clearance from the shiploader operator prior to beginning the maneuver "because it's a serious matter" if one of the vessel's structures strikes the boom.  R.42-3 at 32.  Bessemer's dock foreman concurred, saying that "[i]n order to give permission to shift the boat, the Shiploader operator verifies his equipment is in the clear of all vessel structures . . . including the self unload[er]."  R.42-6 at 25–26. Fertig acknowledges that, on prior occasions, he has checked behind him before giving clearance to see if any vessel structures might hit the boom.  Yet during his deposition he "[could not] say whether" he "look[ed] out the back window to see whether the boom was swung out or not" prior to giving the go-ahead.  R.42-2 at 51, R.60 at 54:22–55:3.  Taken together, the evidence of the operator's responsibility to ensure proper clearance prior to the shift and Fertig's uncertainty as to whether he did so creates a genuine factual issue over Bessemer's comparative negligence.  *Cf. Penn. R.R. Co. v. S.S. Marie Leonhardt*, 320 F.2d 262, 267 (3d Cir. 1963) (drawbridge operator who signals that he will allow passage and who fails to provide adequate clearance at fault when vessel hits bridge).

Bessemer resists this conclusion, claiming that "applicable law" dictates that "the crew of the vessel is solely responsible . . . even where the vessel's crew receives assistance from shore."  Bessemer Br. 55.  But the only case it offers to support its position—an unpublished district court case from another circuit—is neither "applicable law" nor supportive of its proposition.  *See Kure Shipping S.A. v. Louisiana Pac. Corp.*, No. 98-CV-648, 2001 WL 34037327 (N.D. Cal. Aug. 27, 2001) (shore personnel did not assist vessel with a maneuver that resulted in an allision).

To the extent Seaway claims that there remains a triable issue over whether Fertig should have checked the self-unloader's position once the vessel began moving, we disagree. Once the vessel started shifting, his role was to let the vessel know "how close" it was to reaching its next loading position.  R.42-2 at 55.  That task requires the operator to "look[]  north and down," not behind him to the south, where he might have realized that the self-

unloader was headed for the boom. R.42-6 at 26–27. Perhaps Fertig could have looked behind him once the shift began and done something to avert the allision. But Seaway has not shown a genuine issue as to whether doing so fell within the scope of the operator's responsibilities, especially because turning around would have taken him away from his duty to spot the distances the Enterprise needed to travel.

### III.

In its cross-appeal, Bessemer argues that the district court abused its discretion when it determined that Bessemer did not adequately disclose the basis for its lost-profits claim during discovery, when it excluded evidence of the claim under Rule 37 as a result of the inadequate disclosure and when it ultimately granted summary judgment to Seaway on the lost-profits claim.

### A.

Rule 26 of the Federal Rules of Civil Procedure requires a party to provide the opposing party "a computation of each category of damages claimed" as well as "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). The district court found that, with regard to its lost-profits claim, Bessemer fell short of this basic requirement in two respects: by not disclosing the costs it saved during the time its machinery was under repair and by not timely disclosing a further claim for lost profits based on its loss of a major customer. We agree.

### 1.

Bessemer's disclosures consistently failed to account for a critical factor in its lost-profits claim: the costs it saved by not incurring the expenses necessary to earn revenue while the shiploader underwent repairs. *See The Potomac*, 105 U.S. 630, 632 (1881) (lost profits are calculated by deducting costs saved from the lost gross revenue). Bessemer first announced its intent to seek "loss of business damages" in a pre-suit letter demanding approximately $1.4 million from Seaway. Before Bessemer turned over its initial

disclosures, Seaway notified Bessemer that it was "especially looking forward to receipt of all documents relating to the issue of damages." R.33-2.

But Bessemer's initial disclosures gave few answers. Under the heading "A computation of damages claimed by disclosing party pursuant to FRCP 26(a)(1)[(A)(iii)]," Bessemer referred Seaway only to its pre-suit demand letter and noted its intent to claim as damages "any future loss of business revenue that may become known through the course of discovery." R.33-3 at 4–5. Bessemer submitted with its disclosures a one-page spreadsheet entitled "Canadian Enterprise Incident 10-04-05" and listing dollar amounts for "managers time," "employees lay-off," "trains diverted" and "tonnage lost." R.33-4. At the bottom of the page, Bessemer noted that each of these dollar amounts came to the "Grand Total" of $1,601,675, but provided no explanation and no supporting documentation to back up the calculations. R.33-4. Bessemer also submitted a letter from a railroad company documenting one train diversion as a result of the incident. R.33-5.

Understandably dissatisfied with Bessemer's initial disclosures, Seaway continued to demand lost-profits documentation. Seaway's first request for production asked for "a copy of all documents that relate to, support, or are in any way connected with the allegation of lost business," R.33-7 at 7. Bessemer responded by referring Seaway to "documents previously provided." R.33-7 at 8. Subsequent rounds of requests yielded little additional information about the basis of Bessemer's lost profits claim, with Bessemer alternatively claiming that "no . . . documents exist" that would address "overhead savings" as a result of the interruption in operations or referring Seaway to documents "already in [Seaway's possession]." R.33-8, Req. No. 21; *see also* R.33-11 Interrog. No. 2. Seaway continued to ask for supplementation on the issue of net lost profits, without any significant response from Bessemer.

Seaway fared no better in its depositions of Bessemer employees. Seaway's deposition notices to Bessemer's corporate representatives detailed its expectation that the witnesses could provide "an estimate and breakdown as to the actual costs that would have been incurred . . . as a result of the planned carriage" as well as "a breakdown of the actual costs incurred" relating to canceled shipments. A314.

None of Bessemer's corporate representatives could do the job. James Streett, who oversaw Bessemer's docking and railroad operations, confirmed that the one-page spreadsheet was a calculation of Bessemer's lost *gross revenue*, not its lost profits. A544. Streett had no information about any costs Bessemer may have saved and said that he did not know of anyone who would. A544–46. James Rogers, a second corporate representative, also testified about lost gross revenue, and he too had no information about costs saved and did not know of anyone who would. A462–63.

After Streett and Rogers failed to answer these questions, Seaway issued a detailed deposition notice, asking a Bessemer corporate representative to produce "all documents in any way supporting plaintiffs' loss of revenue claim, including savings realized as a result of the cancellation of the shipments described in" the one-page spreadsheet. R. 33-21 at 3. Michael Suter appeared in response to the request, but he did not have the information either. When asked whether Bessemer saved any costs by not having to assemble, load and fuel train cars bound for the shiploader while it was under repair, Suter answered that he could not "tell you whether it was a cost saved or a cost incurred." A191; *see also* A178, A179. When Seaway pressed Suter for documents detailing other costs saved (including the number of railroad cars, the number of engines required, the personnel needed and the number of miles trains would have traveled and the cost per mile, *see* R.33-21 at ¶¶ 6, 7), Suter responded that he "simply [didn't] know what those documents would be." A222.

Seaway presented the uncontested opinion of its economic expert to underscore the inadequacies of Bessemer's disclosures. Bessemer, the expert said, did not turn over "payroll journals," "payroll tax returns," "financial statements," "financial summary reports" and "general ledgers" necessary to verify and analyze Bessemer's claim for lost profits. R.33-22, 7–8. The expert confirmed the summary nature of the financial documents Bessemer disclosed and concluded that Bessemer "provided insufficient data for a proper determination of avoided costs," which precluded the expert from "express[ing] an opinion as to the actual amount of damages, other than that [Bessemer's] presentation [was] significantly flawed." R.33-22, 8. Given Bessemer's chronically inadequate disclosures and given their relevance to the lost-profits claim, the district court did not abuse its discretion

in finding that Bessemer failed to satisfy Rule 26. *See Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009).

Bessemer takes on the district court's ruling from several angles. First, it touts the "simpl[icity]" and "efficien[cy]" of the one-page spreadsheet it produced, claiming it "properly identified the *exact* amount of [Bessemer's] claimed lost profits for diverted trains and trapped coal." Bessemer Reply 9. But "simplicity" and "efficiency" are virtues only if the one-page spreadsheet conveyed all of the necessary information—including costs saved—to support the "exact" amount of lost profits. It did not. As Bessemer's corporate representatives acknowledged, the spreadsheet showed the exact amount of lost gross revenues, not the exact amount of lost profits.

Second, Bessemer argues that, even if the one-page spreadsheet did not satisfy Rule 26, Bessemer produced "all evidence as to 'lost profits'" after the district court entered a protective order for its proprietary information in May 2007. Bessemer Reply at 9. The protective order, it is true, enabled Bessemer to produce additional information in support of its claim. Bessemer turned over tonnage rates for its various clients and train schedules identifying which trains it diverted in the aftermath of the allision. A324, A623–A633. But the rates Bessemer would have charged for the loads that did not run or were diverted elsewhere also go only to lost gross revenues. Still missing, even after entry of the protective order, were figures addressing the costs Bessemer saved.

Third, Bessemer claims that there was nothing to turn over because it saved nothing from the interruption. Bessemer Reply 12–19. But it suspends reality to suggest that Bessemer would not have avoided any costs when it did not have to transport millions of pounds of coal as a result of the dock shutdown, whether it be from fuel not used, employees laid off or the day-to-day cost of operating a shiploader. *See* R.33-22 (report of Seaway's expert detailing incompleteness of Bessemer's initial disclosures).

Finally, Bessemer claims that Seaway asks for too much. Rule 26, Bessemer argues, requires disclosure only of enough evidence to put Seaway on notice of the lost-profits claim. But that is not what Rule 26 says. It requires documents "on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R.

Civ. Pro. 26(a)(1)(A)(iii). Because Bessemer never provided a critical piece of the lost-profits puzzle—evidence of avoided costs—the district court did not abuse its discretion in concluding that Bessemer came up short in meeting its Rule 26 obligations.

2.

Bessemer also did not timely disclose its approximately $1 million claim for loss of business related to the decision of one of its major customers, Stelco, not to renew a contract with Bessemer. Bessemer's initial Rule 26 disclosure in December 2006 stated as a loss "any future loss of business revenue that may become known through the course of discovery." R.33-3 at 5. It did not mention that Stelco had not renewed its contract with Bessemer for the year 2006 and that Bessemer intended to claim damages for the loss. Although Bessemer would have known by the last month of 2006 that Stelco had not renewed its contract for that year, the first mention of Bessemer's intent to claim damages for losing the Stelco contract came at Suter's deposition approximately six months later. A183, 184. Bessemer insists that it provided sufficient notice of this claim by including with its initial disclosures an October 27, 2005 letter from Stelco stating that it was considering not renewing its contract. But the district court did not abuse its discretion in finding that a letter saying that Stelco *might* cancel its contract did not adequately inform Seaway about the extent of damages claimed if Stelco *canceled* the contract.

B.

Given these shortfalls in Bessemer's compliance with its discovery obligations, the district court did not abuse its discretion in excluding evidence of lost-profits damages and, because it had no evidence of lost profits left to consider, granting summary judgment to Seaway. When "a party fails to provide information . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Bessemer has not justified its actions. The requested records, according to the unrebutted opinion of Seaway's expert, were "standard accounting records that are clearly maintained and available." R.33-23, ¶ 10. Bessemer thus cannot excuse its conduct by insisting it had no documents to produce. Nor can it justify its actions on the ground that it

was merely waiting for a protective order before turning over what Seaway needed. Even with the entry of a protective order in May 2007, Bessemer continued to evade Seaway's requests for information about costs avoided (save for its release of additional information regarding tonnage rates and train schedules) and waited nearly two months more before notifying Seaway of its Stelco lost-contract claim. Bessemer's meager excuses, the court permissibly concluded, did not amount to substantial justification.

Nor did the district court exceed its discretion in concluding that Bessemer's omissions were not harmless. Because Bessemer never turned over supporting documentation for its lost-profits calculation, Seaway's expert could not independently analyze Bessemer's claim. And Bessemer's six-month delay in disclosing its million-dollar Stelco contract claim prevented Seaway from exploring the basis of that claim during depositions and discovery.

Bessemer responds that the district court used the wrong standard in evaluating whether discovery sanctions were appropriate. Rather than Rule 37(c)'s "substantially justified or harmless" standard for determining whether to excuse inadequate disclosures, Bessemer claims that the district court should have used a four-part test used to determine the appropriateness of dismissal as a discovery sanction under Rule 37(b). *See Phillips v. Cohen*, 400 F.3d 388, 402 (6th Cir. 2005) (to justify dismissal as a discovery sanction under Rule 37(b), courts should consider "(1) evidence of willfulness or bad faith; (2) prejudice to the adversary; (3) whether the violating party had notice of the potential sanction; (4) whether less drastic sanctions have been imposed or ordered"). But that four-part test is "an altogether different test" than the one for exclusion of the evidence under Rule 37(c), for which "the test is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Vance ex rel Hammons v. United States*, No. 98-5488, 1999 WL 455435, at *6 (6th Cir. June 25, 1999) (rejecting a similar argument).

IV.

For these reasons we affirm as to lost-profits damages, reverse in part as to liability and remand for further proceedings.